No. 67,622

STATE OF KANSAS, *ex rel.*, ROBERT T. STEPHAN, Attorney General, *Petitioner*, v. THE HONORABLE JOAN FINNEY, Governor for the State of Kansas, *Respondent*.

(836 P.2d 1169)

Opinion filed July 10, 1992.

*Robert T. Stephan,* attorney general, argued the cause for the petitioner.

*William B. McCormick,* special counsel to the governor, argued the cause for the respondent Governor Joan Finney.

*Dan Watkins,* of Lawrence, was on the brief for *amicus curiae* Sac and Fox Nation of Missouri in Kansas and Nebraska.

*Lance W. Burr*, of Lawrence, was on the brief for *amicus curiae* Kickapoo Nation in Kansas.

*Harold T. Walker*, city attorney, was on the brief for *amicus curiae* City of Kansas City, Kansas.

*Robert L. Pirtle*, of Pirtle, Morisset, Schlosser & Ayer, of Seattle, Washington, was on the brief for *amicus curiae* Prairie Band of Potawatomi Indians.

*Per Curiam*: This is an original action in mandamus and quo warranto wherein the Attorney General of Kansas challenges the authority of the Governor of Kansas to negotiate and enter into a binding tribal-state compact under the Indian Gaming Regulatory Act (IGRA) (25 U.S.C. § 2701 *et seq.* [1988]). The compact in issue authorizes casino gambling on the Kickapoo Indian Reservation located within the State of Kansas, said gambling operation to be monitored by the State of Kansas. Additional issues involve whether or not this original action is an appropriate vehicle for the determination of the central issue.

At this point a statement relative to the, enactment and provisions of IGRA is appropriate to establish the background giving rise to this litigation. IGRA became law on October 17, 1988. See United States Senate Bill No. 555. The bill was referred to the Select Committee on Indian Affairs. The Committee's report filed August 3, 1988, (S. Rep. No. 446, 100th Cong., 2d Sess. 1-6, *reprinted in* 1988 U.S. Code Cong. & Ad. News 3071) contains an in-depth discussion of the development and purpose of the Act. The following is excerpted therefrom:

### "PURPOSE

"S. 555 provides for a system for joint regulation by tribes and the Federal Government of class II gaming on Indian lands and a system for compacts between tribes and States for regulation of class III gaming. The bill establishes a National Indian Gaming Commission as an independent agency within the Department of the Interior. The Commission will have a regulatory role for class II gaming and an oversight role with respect to class III.

### "BACKGROUND

"S. 555 is the outgrowth of several years of discussions and negotiations between gaming tribes, States, the gaming industry, the administration, and the Congress, in an attempt to formulate a system for regulating gaming on Indian lands. In developing the legislation, the issue has been how best to preserve the right of tribes to self-government while, at the same time,

to protect both the tribes and the gaming public from unscrupulous persons. An additional objective inherent in any government regulatory scheme is to achieve a fair balancing of competitive economic interests.

"The need for Federal and/or State regulation of gaming, in addition to, or instead of, tribal regulation, has been expressed by various State and Federal law enforcement officials out of fear that Indian bingo and other gambling enterprises may become targets for infiltration by criminal elements. While some States have attempted to assert jurisdiction over tribal bingo games, tribes have very strenuously resisted these attempts. It was this conflict which gave rise to the *California v. Cabazon Band of Mission Indians* case (*Cabazon*), decided by the Supreme Court on February 25, 1987. (480 U.S. 202, 94 L. Ed. 2d 244, [107 S. Ct. 1083,] 1987). The Court, using a balancing test between Federal, State, and tribal interests, found that tribes, in States that otherwise allow gaming, have a right to conduct gaming activities on Indian lands unhindered by State regulation. This decision followed a long line of cases that began with the case of *Seminole v. Butterworth*, (658 F. 2d 3110, 5th Cir., 1982, cert. denied 1982).

. . . .

"Since the Seminole Tribe opened its game and succeeded in court, over 100 bingo games have been started on Indian lands in states where bingo is otherwise legal. As established in testimony presented to the Committee, it was determined that collectively, these games generate more than $100 million in annual revenues to tribes. Indian tribal elected officials demonstrated to the Committee that bingo revenues have enabled tribes, like lotteries and other games have done for State and local governments, to provide a wider range of government services to tribal citizens and reservation residents than would otherwise have been possible. For various reasons, not all tribes can engage in profitable gaming operations. However, for those tribes that have entered into the business of business, the income often means the difference between an adequate governmental program and a skeletal program that is totally dependent on Federal funding.

. . . .

"However, in the final analysis, it is the responsibility of the Congress, consistent with its plenary power over Indian affairs, to balance competing policy interests and to adjust, where appropriate, the jurisdictional framework for regulation of gaming on Indian lands. S. 555 recognizes primary tribal jurisdiction over bingo and card parlor operations although oversight and certain other powers are vested in a federally established National Indian Gaming Commission. For class III casino, parimutuel and slot machine gaming, the bill authorizes tribal governments and State governments to enter into tribal-State compacts to address regulatory and jurisdictional issues.

### "STATEMENT OF POLICY

. . . .

"It is also true that S. 555 does not contemplate and does not provide for the conduct of class III gaming activities on Indian lands in the absence

of a tribal-State compact. In adopting this position, the Committee has carefully considered the law enforcement concerns of tribal and State governments, as well as those of the Federal Government, and the need to fashion a means by which differing public policies of these respective governmental entities can be accommodated and reconciled. This legislation is intended to provide a means by which tribal and State governments can realize their unique and individual governmental objectives, while at the same time, work together to develop a regulatory and jurisdictional pattern that will foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied."

The pertinent portions of IGRA are highly summarized as follows. All gaming is divided into three classes. Class I games are social games played for minimal prizes. Regulation thereof is wholly left to the tribe. Class II games are bingo and bingo-like games. The regulation thereof is a matter wholly between the tribe and National Indian Gaming Commission. Class III games are those not in Class I or II and include slot machines, lotteries, parimutuel wagering, and casino gambling. See 25 U.S.C. §§ 2703, 2710 (1988).

In order to place the primary issue before us within a meaningful context the procedure for establishing a tribal-state compact must be set forth in some detail. If a tribe seeks to establish Class III games on its reservation, it must first pass an ordinance to that effect which must be approved by the Chairman of the National Indian Gaming Commission. IGRA then sets forth, in pertinent part, the following procedures:

"(3)(A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

"(B) Any State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register.
. . . .
"(7)(A) The United States district courts shall have jurisdiction over—

(i) any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under paragraph (3) or to conduct such negotiations in good faith, [and] .

. . . .

(iii) any cause of action initiated by the Secretary to enforce the procedures prescribed under subparagraph (B)(vii).

"(B)(i) an Indian tribe may initiate a cause of action described in subparagraph (A)(i) only after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).

(ii) In any action described in subparagraph (A)(i), upon the introduction of evidence by an Indian tribe that—

(I) a Tribal-State compact has not been entered into under paragraph (3), and

(II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith, the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities.

(iii) If, in any action described in subparagraph (A)(i), the court finds that the State has failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of gaming activities, the court shall order the State and the Indian Tribe to conclude such a compact within a 60-day period. In determining in such an action whether a State has negotiated in good faith, the court—

(I) may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and

(II) shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.

(iv) If a State and an Indian tribe fail to conclude a Tribal-State compact governing the conduct of gaming activities on the Indian lands subject to the jurisdiction of such Indian tribe within the 60-day period provided in the order of a court issued under clause (iii), the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact. The mediator shall select from the two proposed compacts the one which best comports with the terms of this Act and any other applicable Federal law and with the findings and order of the court.

(v) The mediator appointed by the court under clause (iv) shall submit to the State and the Indian tribe the compact selected by the mediator under clause (iv).

    (vi) If a State consents to a proposed compact during the 60-day period beginning on the date on which the proposed compact is submitted by the mediator to the State under clause (v), the proposed compact shall be treated as a Tribal-State compact entered into under paragraph (3).

    (vii) If the State does not consent during the 60-day period described in clause (vi) to a proposed compact submitted by a mediator under clause (v), the mediator shall notify the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures—

        (I) which are consistent with the proposed compact selected by the mediator under clause (iv), the provisions of this chapter and the relevant provisions of the laws of the State, and

        (II) under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction.

"(8)(A) The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe.

"(B) The Secretary may disapprove a compact described in subparagraph (A) only if such compact violates—

(i) any provision of this chapter,

(ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or

(iii) the trust obligations of the United States to Indians.

"(C) If the Secretary does not approve or disapprove a compact described in subparagraph (A) before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter.

"(D) The Secretary shall publish in the Federal Register notice of any Tribal-State compact that is approved, or considered to have been approved, under this paragraph." 25 U.S.C. § 2710.

With this IGRA framework established, we can now turn to the chronology of events concerned herein.

August 28, 1991—Kickapoo Nation in Kansas served a request on Governor Finney to negotiate a tribal-state compact relative to Class III gaming activities on its reservation.

January 16, 1992—Kickapoo Nation and Governor Finney execute a tribal-state compact.

January 22, 1992—Original tribal-state compact is received by the Department of Interior for approval.

January 24, 1992—Kansas House Concurrent Resolution introduced which urges Secretary of Interior to withhold approval of compact because the Kansas Legislature's approval thereof

is required and the same has not been secured. (Bill died January 27, 1992.)

February 5, 1992—Action herein filed challenging respondent Governor's authority to negotiate and enter into said compact.

February 6, 1992—Order entered requesting the Governor to file a response to said petition.

February 11, 1992—House Bill No. 2928 introduced in Kansas Legislature which would authorize Governor or her designated representative to negotiate tribal-state compacts and to sign same on behalf of the State. Attorney General is designated as Governor's legal counsel in such negotiations. (Bill died in committee May 26, 1992).

February 25, 1992—Senate Bill No. 739 introduced which would create the Kansas Legislative Commission on State-Indian Affairs which would be charged with negotiation of tribal-state compacts. (Bill died in committee, May 26, 1992.)

February 28, 1992—Department of Interior notifies the Kickapoo Nation that certain revisions in the compact are necessary. Revisions primarily concern a reduction in the amount of tribal reimbursement for expenses by the State. Reference is made in said letter to the case herein being filed and that a departmental assessment on the issue of Governor Finney's authority to enter into the compact will be deferred pending resolution of the court proceeding.

March 2, 1992—Revised compact executed correcting reimbursement provision objections. The Governor signs the same on behalf of the State of Kansas.

March 4, 1992—Revised compact received by Secretary of Interior.

March 13, 1992—Letter from Department of Interior to the Kickapoo Nation advising: (1) Department will approve compact if the Kansas Supreme Court determines that "the Governor is authorized to bind the State to the compact"; and (2) the department considers the 45-day period for approval specified in 25 U.S.C. § 2710(d)(8) will commence to run when the Kansas Supreme Court's decision is issued.

March 30, 1992—The Governor files her answer to petition herein.

May 14, 1992—Petitioner Attorney General's reply filed.

May 19, 1992—Declaratory judgment/mandamus action filed in United States District Court for the District of Columbia by the Kickapoo Nation and Governor of Kansas against Secretary of Interior to compel approval of compact by the Secretary based upon the running of the statutory 45-day period for approval.

May 20, 1992—Oral arguments heard herein, and case taken under advisement.

The first issue before us is whether or not the petition filed herein seeking a writ of mandamus and quo warranto is an appropriate vehicle for the relief sought.

The Governor contends that the relief sought herein would constitute only an advisory opinion inasmuch as the tribal-state compact is not an enforceable instrument unless and until it is approved by the Secretary of the Interior. Subsequent to the filing of the Governor's answer and supplemental memorandum of points, the Secretary of the Interior advised the Kickapoo Nation and the petitioner herein that he will take no action until such time as this court determines whether the Governor has the authority to bind the State of Kansas to the terms of the compact.

State ex rel. Stephan v. Kansas House of Representatives, 236 Kan. 45, 687 P.2d 622 (1984), involved a rather analogous situation to the matter we are asked to determine herein. The State, on the relation of the attorney general, brought a mandamus/quo warranto action against the Kansas House of Representatives and then-Governor John Carlin, contending that the respondent legislative body had exceeded its powers and usurped the powers of the executive branch of government by enacting a statute (K.S.A. 1983 Supp. 77-426 [c] and [d]) which allowed the legislature to adopt, modify, or revoke administrative rules and regulations through concurrent resolutions without presentment to the governor. The court held that the house of representatives was not a proper party to the action but held the proceedings

in mandamus and quo warranto to be an appropriate vehicle. We stated:

"The Supreme Court is granted original jurisdiction in proceedings in mandamus and quo warranto by art. 3, § 3 of the Kansas Constitution. K.S.A. 60-801 defines mandamus as 'a proceeding to compel some . . . person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law.' It has been held mandamus is an appropriate proceeding designed for the purpose of compelling a public officer to perform a clearly defined duty, one imposed by law and not involving the exercise of discretion. *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, Syl. ¶ 2 [, 643 P.2d 87 (1982)]. Numerous prior decisions have recognized mandamus is a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact that there also exists an adequate remedy at law. 231 Kan. 20, Syl. ¶ 4; *Mobil Oil Corporation v. McHenry*, 200 Kan. 211, 239, 436 P.2d 982 (1968), and cases cited therein. Where a petition for mandamus presents an issue of great public importance and concern, the court may exercise its original jurisdiction in mandamus and settle the question. *Berst v. Chipman*, 232 Kan. 180, 183, 653 P.2d 107 (1982).

"Original actions in quo warranto may be brought in this court when 'any person shall usurp, intrude into or unlawfully hold or exercise any public office.' K.S.A. 60-1202(1). This court has recognized on several occasions that in a proper case an original action in quo warranto is an appropriate procedure to question the constitutionality of a statute. *E.g., State ex rel. Stephan v. Martin*, 230 Kan. 747, Syl. ¶ 1, 641 P.2d 1011 (1982).

. . . .

"Relief in the nature of quo warranto and mandamus is discretionary. *State ex rel. Stephan v. Carlin*, 229 Kan. [665, 666, 630 P.2d 709 (1981)]. This court may properly entertain this action in quo warranto and mandamus if it decides the issue is of sufficient public concern.

"The legislature further argues this case does not present a case or controversy because the state has suffered no recognizable injury. It is apparent from the above discussion relating to the propriety and purpose of actions in quo warranto and mandamus that this issue is entirely without merit. This action is brought both to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business and to question the constitutionality of the legislature's actions. In addition, an actual controversy is presented where it is alleged by the attorney general, on behalf of the people of this state, that the legislature has exceeded its power and usurped the authority of the executive branch. 'The state is a proper party—indeed *the* proper party—to bring this action. The state is always interested where the integrity of its constitution or statutes is involved.' *State ex rel. v. Doane*, 98 Kan. 435, 440, 158 Pac. 38 (1916). In *INS v. Chadha*, 462 U.S. 919, 939, 77 L. Ed. 2d 317, 103 S.

Ct. 2764, 2778 (1983), a similar argument was rejected where the constitutionality of a one-house legislative veto was challenged." 236 Kan. at 52-53.

In *State ex rel. Stephan v. Kansas Racing Comm'n*, 246 Kan. 708, 716, 792 P.2d 971 (1990), we stated:

"This court has consistently recognized that mandamus is a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact that another adequate remedy at law exists. *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 52, 687 P.2d 622 (1984); *Board of Sedgwick County Commr's v. Noone*, 235 Kan. 777, 779, 682 P.2d 1303 (1984); *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, 26, 643 P.2d 87 (1982)."

In this action the State of Kansas, on the relation of its Attorney General, is contending that the head of the executive branch of government has exceeded the constitutional authority granted that office and usurped the constitutional power granted to the legislative branch of government. The subject of the alleged usurpation is neither minor nor inconsequential. The compact in question, if approved by the Secretary of the Interior, contains provisions which would require the State to expend substantial sums of money in hiring and training new personnel as well as accomplishing a multitude of changes in existing law, all as will be set forth more specifically in our determination of the merits of the case herein.

Clearly, this is a matter of great statewide concern. Additionally, to those directly involved the matter demands immediate settlement. It would be no service to the Kickapoo Nation or other tribes such as the Sac and Fox Nation and the Prairie Band of Potawatomi Indians, who are seeking negotiations with the State of Kansas leading to tribal-state compacts, to leave the matter unresolved and let those involved proceed at the peril of subsequent invalidation of the negotiations. In view of the position of the Department of Interior, the whole question of tribal-state compacts could just hang in limbo were we not to determine the issue raised.

We have no hesitancy in concluding that an actual controversy of great public importance and concern exists and that the essential purpose of the proceeding is to obtain an authoritative

interpretation of the law for the guidance of public officials in the administration of the public business. The mandamus/quo warranto proceeding herein is an appropriate vehicle for the resolution of the issue.

Before commencing our discussion of the central issue, it is important to emphasize the narrowness of that issue. We are asked herein to determine whether the Governor of the State of Kansas, as head of the executive branch of Kansas government, has the authority to bind the State to the compact entered into with the Kickapoo Nation. The Attorney General contends the power to bind is a legislative rather than an executive function. There are a number of significant related questions which are outside the scope of the proceedings herein. Included therein are the following:

1. Is Kansas a state which is subject to the negotiation provisions of IGRA relative to Class III casino gaming?

2. Does any Kansas public official have authority to enter into a compact permitting an activity (casino gaming) which is prohibited by the Kansas Constitution?

3. Does the federal government have the power to compel the State of Kansas to negotiate with an Indian nation for a compact under which the State would be required to regulate or otherwise condone or allow an activity situated within its borders which is in violation of the Kansas Constitution?

Art. 15, § 3 of the Kansas Constitution provides:

"Lotteries and the sale of lottery tickets are forever prohibited."

The court has considered on several occasions what constitutes a lottery and has construed the term broadly to include any act of gaming which includes the elements of consideration, prize, and chance. *Lambeth v. Levens*, 237 Kan. 614, 623, 702 P.2d 320 (1985). Examples of specific acts falling within the constitutionally prohibited conduct include bingo and slot machines (*State v. Nelson*, 210 Kan. 439, 502 P.2d 841 [1972]; parimutuel betting on dog races (*State, ex rel., v. Bessing*, 178 Kan. 111, 283 P.2d 418 [1955]); theater bank nights (*State, ex rel., v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P.2d 929 [1936]); and a "playing policy" (*State ex rel. v. Mercantile Association*, 45 Kan. 351, 25 Pac. 984 [1891]).

The following amendments narrowed the lottery prohibition:
Art. 15, § 3a:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas the legislature may regulate, license and tax the operation or conduct of games of 'bingo,' as defined by law, by bona fide nonprofit religious, charitable, fraternal, educational and veterans organizations."

Art. 15, § 3b:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas, the legislature may permit, regulate, license and tax, at a rate not less than 3% nor more than 6% of all money wagered, the operation or conduct, by bona fide nonprofit organizations, of horse and dog racing and parimutuel wagering thereon in any county in which: (a) A majority of the qualified electors of the county voting thereon approve this proposed amendment; or (b) the qualified electors of the county approve a proposition, by a majority vote of those voting thereon at an election held within the county, to permit such racing and wagering within the boundaries of the county. No off-track betting shall be permitted in connection with horse and dog racing permitted pursuant to this section."

Art. 15, § 3c:

"Notwithstanding the provisions of section 3 of article 15 of the constitution of the state of Kansas, the legislature may provide for a state-owned and operated lottery, except that such state-owned lottery shall not be operated after June 30, 1990, unless authorized to be operated after such date by a concurrent resolution approved by a majority of all of the members elected (or appointed) and qualified of each house and adopted in the 1990 regular session of the legislature. The state shall whenever possible provide the public information on the odds of winning a prize or prizes in a lottery game."

Legislation was enacted regulating bingo (K.S.A. 79-4701 *et seq.*); horse and dog racing with parimutuel betting thereon (K.S.A. 1991 Supp. 74-8801 *et seq.*); and state-owned and operated lottery (K.S.A. 1991 Supp. 74-8701 *et seq.*).

That portion of IGRA codified as 25 U.S.C. 2710(d)(1) provides, in pertinent part:

"Class III gaming activities shall be lawful on Indian lands only if such activities are—

. . . .

(B) *located in a State that permits such gaming for any purpose by any person, organization, or entity,* and

(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." (Emphasis supplied.)

By this provision was it the Congressional intent that if a state allows any class III gaming on even a limited basis, then it "permits" all class III gaming for IGRA purposes? The question has been answered in the affirmative in *Lac du Flambeau Indians v. State of Wis.*, 770 F. Supp. 480 (W.D. Wis. 1991). The appeal therefrom by the State of Wisconsin was dismissed on procedural grounds (957 F.2d 515 [7th Cir. 1992]). The issue has also been raised in *Poarch Band of Creek Indians v. State of Ala.* 776 F. Supp. 550 (S.D. Ala. 1991), but the decision therein relates only to the dismissal of the action as to the State of Alabama itself as a defendant on the grounds it did not consent to suit pursuant to the Eleventh Amendment of the United States Constitution. The Alabama governor, who was also a defendant therein, was unaffected by said dismissal. The action remains viable, apparently, but no further decision has been filed therein. This issue was initially raised in the action before us but was abandoned at oral argument.

The action herein is based upon the premise that Kansas is "a state that permits such gaming" and hence is subject to negotiations for a tribal-state compact under IGRA.

We turn now to our discussion of the narrow issue raised herein. Does the respondent Governor have the authority to negotiate a tribal-state compact with the Kickapoo Nation and bind the State of Kansas to the terms thereof?

The Governor contends she has such authority. Her position may be summarized as follows. The Governor is declared by art. 1, § 3 of the Kansas Constitution to be the supreme executive power of Kansas. K.S.A. 75-107 provides:

"The governor shall transact all the business of the state, civil and military, with the general government, except in cases otherwise specially provided by law."

"General government" means the federal government, and the negotiation of tribal-state compacts under IGRA is a matter of federal law. Section J 3.(b) of the guidelines of the Department of the Interior relative to IGRA requires all tribal-state compacts to be signed by the governor of the involved state. It is neither

practical nor feasible for the legislature to negotiate or participate in the negotiation or execution of such compacts by virtue of the time limitations contained in IGRA as: (1) The legislature is only in session a small percentage of the year; and (2) by its very nature, the legislature is wholly unsuited to the negotiation process. Expediency requires that the Governor be held to have the authority to act on behalf of the State in IGRA matters.

The position of the State of Kansas through the Attorney General may be summarized as follows. Whereas the Kansas Constitution makes the governor the head of the executive branch, the governor is responsible only for the enforcement of the laws of the state (art. 1, § 3). The legislative power is vested in the house of representatives and the senate (art. 2, § 1). The compact is essentially legislative in nature and the State can only be bound thereby through appropriate legislative authorization. K.S.A. 75-107 is not a legislative grant of authority to the governor which encompasses negotiations on a binding tribal-state compact under IGRA as the State negotiates therein with an Indian tribe, not the federal government. Such negotiations are not the transaction of business with the federal government. Additionally, the question of the governor's authority to bind the State herein is a matter of state law. IGRA does not and cannot confer Kansas legislative power on the governor in violation of the separation of powers clearly set forth in the Kansas constitution.

We shall first dispose of some of the statutory points advanced by respondent Governor. K.S.A. 75-107, reiterated for convenience, provides:

"The governor shall transact all the business of the state, civil and military, with the general government, except in cases otherwise specially provided by law."

We find this statute inapplicable herein for a variety of reasons. The compact herein and negotiations leading thereto are between the Governor and the Kickapoo Nation—not the federal government. Further, the transaction of business connotes the day-to-day operation of government under previously established law or public policy. The implementation of law and policy rather than the enactment of law and the determination of public policy constitutes the transaction of business between Kansas and the

federal government. The *carte blanche* interpretation asserted by the Governor herein is massive in its implication and, additionally, would have serious problems if challenged on grounds that it constitutes an impermissible delegation of the legislature's lawmaking powers.

Reference has also been made to K.S.A. 75-106, which provides:

"All proclamations, warrants and requisitions required by law to be made or issued by and in the name of the executive of the state shall be signed by the executive personally."

There is no serious claim that the compact herein is a proclamation, warrant, or requisition. The purpose of the statute clearly is to make the signing of such documents by the Governor a function of the office which may not be delegated. We find no applicability of the statute to the issue before us.

We also note K.S.A. 48-925, which sets forth powers granted to the Governor during a period when a state of disaster emergency has been declared under K.S.A. 1991 Supp. 48-924. K.S.A. 48-925 provides, in part:

"(b) Under the provisions of this act and for the implementation thereof, the governor may issue orders and proclamations which shall have the force and effect of law during the period of a state of disaster emergency declared under subsection (b) of K.S.A. 48-924 and which orders and proclamations shall be null and void thereafter unless ratified by concurrent resolution of the legislature. Such orders and proclamations may be revoked at any time by concurrent resolution of the legislature.

"(c) During a state of disaster emergency declared under K.S.A. 48-924, and in addition to any other powers conferred upon the governor by law, the governor may: (1) Suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business, or the orders or rules or regulations of any state agency which implements such statute, if strict compliance with the provisions of such statute, order or rule or regulation would prevent, hinder or delay in any way necessary action in coping with the disaster."

This limited delegation of legislative power to the Governor is effective only during a period of disaster and is inapplicable herein.

We conclude the legislature has enacted no legislation authorizing the Governor to negotiate the compact herein and bind the State thereby.

This brings us to the arguments relative to whether IGRA requires that the Governor act on behalf of the State in negotiating tribal-state compacts and binding the State thereto. The act is silent relative to who or what group negotiates on behalf of the State. The only reference to a governor's function in connection with IGRA is in 25 U.S.C. § 2719(b)(1)(A) (1988) concerning gaming on lands acquired by a tribe after October 17, 1988. Gaming upon such lands is generally prohibited (with exceptions) unless:

"(A) The Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination."

The guidelines issued by the Department of Interior relative to IGRA require that the tribes submit tribal-state compacts simultaneously to the Department of the Interior and the local area office (for Indian Affairs). Upon receipt of same, § J 3.(b) requires the area director to "transmit" the following "information."

"(b) The compact is signed by the Governor of the State or his/her representative."

To whom or what agency or organization said information is to be transmitted is not stated.

Viewed individually or collectively, these two provisions do not establish any requirement in IGRA that a tribe negotiate with the governor of a state. Additionally, a contrary argument could be made relative to 25 U.S.C. § 2719(b)(1)(A). The situs of the proposed gaming activity must be set forth in the tribal-state compact. If the same must have been negotiated and entered into by the Governor on behalf of the State, then why does the statute require the Governor's concurrence with the Secretary of the Interior findings that gaming on lands acquired by the tribe after October 17, 1988, would not be detrimental? Surely, the Governor's opinion that such a location would not be detrimental to the surrounding community would be inherent in the Governor's negotiation and execution of the compact. The obtuse

provision in the guidelines requiring the area director to transmit to an unspecified person or persons the information that the compact had been signed by the governor is hardly authority for anything. Indeed, there is no showing the guidelines, in their totality, have any force of law or legal weight. At most, the guidelines appear to be an in-house document aimed at establishing a procedure for the Department of Interior's processing and review of tribal-state compacts and other IGRA matters. Inasmuch as nothing in IGRA purports to require that the governor of a state negotiate a compact and bind the state thereto, we need not determine whether or not such provisions would be lawful.

For her next point, the respondent Governor calls our attention to 25 U.S.C. § 1323 (1988) and certain cases arising thereunder. To place the point in context, reference needs to be made to Public Law 83-280 (18 U.S.C. § 1162 [1988]; 28 U.S.C. § 1360 [1988]), wherein the federal government gave six states jurisdiction over certain criminal offenses and civil causes occurring on Indian lands. Kansas has never been under Public Law 83-280. In 1968, Congress enacted 25 U.S.C. § 1323, which authorized the United States to accept retrocession by any state of all or any part of the jurisdiction acquired by Public Law 83-280. Under Presidential Executive Order No. 11435, issued November 21, 1968, the Secretary of the Interior was designated as the entity to accept such retrocession.

A series of cases arose thereafter attempting to invalidate retrocessions previously accepted by the Secretary of the Interior on asserted grounds that would render the retrosession invalid by virtue of the form in which it was presented for approval or the state authority under which retrocession was sought.

In *Oliphant v. Schlie*, 544 F.2d 1007 (9th Cir. 1976), *rev'd on other grounds* 435 U.S. 191, 55 L. Ed. 2d 209, 98 S.Ct. 1011 (1978), the court stated:

"Oliphant argues that the Governor's proclamation was invalid under the state law and can have no effect. In our opinion, the question is one of federal law, not state law. The acceptance of the retrocession by the Secretary, pursuant to the authorization of the President, made the retrocession effective, whether or not the Governor's proclamation was valid under Wash-

ington law. In this respect, we agree with the views of Judge Denney in *United States v. Brown*, D.Neb., 1971, 334 F. Supp. 536, 540-41:

'The federal government, having plenary power over the Indians, had the power to prescribe any method or event it desired to trigger its own re-assumption of control over Indian affairs within a state: In fact, the triggering event could have been devoid of any mention of state action at all.

'The plenary power of the federal government over Indian affairs, the inescapable difficulty of requiring the Secretary to delve into the internal workings of the state government, and the reliance of the federal government upon what appeared to have been a valid state action, are all factors to be considered and lead the Court to the conclusion that the federal interpretation of the effectiveness of state action triggering the re-assertion of federal jurisdiction is and was controlling. "Retrocession" does not imply any particular procedure or action on the part of the states involved and the need for finality and importance of the various competing interests here dictates that the state action presented complies with the federal requirements of "retrocession."

'The federal government, having the power to preempt jurisdiction over the Omaha Reservation, had the power to so define and construe the word "retrocession" as to remove from the determination of federal assumption of jurisdiction any question of the procedural validity or invalidity of the state's act of retrocession. Considering the problems presented by any other holding, the Court holds that the term "retrocession," as determined by the Secretary of Interior, was fulfilled by such action as the state took in Resolution 37.'

To the same effect is *Omaha Tribe v. Village of Walthill*, D.Neb., 1971, 334 F. Supp. 823, *affirmed*, 8 Cir., 1972, 460 F.2d 1327, *cert. denied*, 1973, 409 U.S. 1107, 93 S. Ct. 898, 34 L. Ed. 2d 687." 544 F.2d at 1012.

We find 25 U.S.C. § 1323 and the cases thereunder inapplicable herein. By retrocession, a state was simply giving up certain Indian jurisdiction the federal government had previously granted it under Public Law 83-280. At the times the challenges were made, the retrocession was a fait accompli. The federal government had reasserted its jurisdiction and had expended funds on Indian lands in establishing law enforcement and judicial services. The retroceding state, by its retrocession, had assumed no ongoing duties or functions as in the matter before us, and this circumstance alone distinguishes the situation. However, the rationale in such cases are inapplicable for another reason. The issue before us is the authority of the Governor to negotiate with the Kickapoo Nation and bind the State of Kansas to the compact. The Secretary of the Interior is not a party to this action and

the propriety of his future act of approval or disapproval of the compact is not within the scope of this action.

We turn now to the primary issue presented. Does the Governor have the authority independent of statute to negotiate the compact herein and bind the State to its terms? For such authority to exist, its source must be the Kansas Constitution.

Art. 1, § 3 of the Kansas Constitution provides:

"The supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state."

Art. 2, § 1 of the Kansas Constitution provides:

"The legislative power of this state shall be vested in a house of representatives and senate."

The doctrine of separation of powers was stated in *State ex rel. Stephan v. Kansas House of Representatives,* 236 Kan. 45, 687 P.2d 622 (1984), as follows:

"Like the Constitution of the United States, the Kansas Constitution contains no express provision establishing the doctrine of separation of powers. However, it has been recognized that the very structure of the three-branch system of government gives rise to the doctrine. *State v. Greenlee,* 228 Kan. 712, 715, 610 P.2d 1132 (1980); *State ex rel. v. Bennett,* [219 Kan. 285, 287, 547 P.2d 786 (1976)]; *Leek v. Theis,* 217 Kan. 784, 804, 539 P.2d 304 (1975); *Van Sickle v. Shanahan,* 212 Kan. 426, 440, 511 P.2d 223 (1973). The doctrine of separation of powers is an outstanding feature of the American constitutional system. The governments, both state and federal, are divided into three branches, *i.e.,* legislative, executive and judicial, each of which is given the powers and functions appropriate to it. Thus, a dangerous concentration of power is avoided through the checks and balances each branch of government has against the other. *Van Sickle v. Shanahan,* 212 Kan. at 439-40; *State, ex rel. v. Bennett,* 219 Kan. at 287; *State v. Greenlee,* 228 Kan. at 715. Generally speaking, the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws; and the judicial power is the power to interpret and apply the laws in actual controversies. *Van Sickle v. Shanahan,* 212 Kan. at 440." 236 Kan. at 59.

In 16 Am. Jur. 2d, Constitutional Law § 303, pp. 818-19, executive power is discussed as follows:

"In the allotment of the powers of government to the three departments, purely executive powers are confined to the executive department. The executive power is the power to execute the laws, that is, to carry them into effect, as distinguished from the power to make the laws and the power to judge them.

"All executive power is granted by the constitution, and the executive branch can exercise no power not derived from the instrument.

"It has been said that the executive power is more limited than legislative powers, extending merely to the details of carrying into effect laws enacted by the legislature as they may be interpreted by the courts, the legislature having the power, except where limited by the constitution itself, to stipulate what actions executive officers shall or shall not perform. As are all of the three main branches of government, the executive is independent. And in accordance with the general principles of the separation 'of powers,' the executive department cannot generally usurp or exercise judicial or legislative power, and, by the same token, the executive power may not be encroached upon or interfered with by the judiciary or the legislative branch. It is as important to preserve and protect the powers of the executive branch of the government and its ability to function as it is to preserve and protect the other branches."

In 16 Am. Jur. 2d, Constitutional Law § 318, pp. 849-50, the following is said relative to legislative power:

"The legislature is one of the three main departments of government, and under the principle of the separation of governmental powers, the legislative power of the state is vested in the state legislature exclusively. The body is vested with the whole of the legislative power of the state; there can be no legislation by either the courts or the executive branch of government. The legislative power has been described generally as being the power to make, alter, and repeal laws. It has also been said that the essential of the legislative function is the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct within the limitations laid down by the constitution.

"The legislative power has been characterized as the vital function which animates, directs, and controls the whole operation of civil authority; it is the most important of all the powers of government, being that in which the supremacy of the government itself consists."

See also 38 Am. Jur. 2d, Governor § 4, pp. 934-35, wherein it is stated:

"Since the governor is a mere executive officer, his general authority is narrowly limited by the constitution of the state, and he may not exercise any legislative function except that granted to him expressly by the terms of the constitution. Hence, a contract entered into with a third person by the governor upon his assumption of authority, which contract is within the province of the legislative department only, will not bind the state; the governor's act is purely ultra vires."

In determining whether or not the head of the executive branch has the authority to negotiate and bind the State to the compact,

some examination of the terms of the compact is necessary in order to establish the nature of the obligations undertaken.

Under the compact, the State is granted the authority to monitor the casino gaming operation. The "State Gaming Agency" is to be responsible for overseeing operations. Section 4 of the compact provides that:

"(o) 'State Gaming Agency' means the Kansas Lottery or a division thereof or such other agency of the State as the Governor may from time to time designate by written notice to the Tribe as the single state agency responsible for oversight of Class III Gaming as authorized by this Compact."

Section 7 of the compact reads as follows:

"STATE ENFORCEMENT OF COMPACT PROVISIONS.

"(a) Monitoring. The State Gaming Agency shall, pursuant to the provisions of this Compact, have the authority to monitor the Tribal gaming operation to ensure that the operation is conducted in compliance with the provisions of this Compact. In order to properly monitor the Tribal gaming operation, agents of the State Gaming Agency shall have reasonable access to all areas of the gaming facility during normal operating hours without giving prior notice to the Tribal gaming operation; provided, however, that the monitoring activities of these agents shall not interfere with the normal functioning of the Tribal gaming operation; and provided further that before agents of the State Gaming Agency shall be entitled to enter the non-public areas of the Tribal gaming facility, they shall provide proper identification to the appropriate authorities.

"(b) Access to Records. Agents of the State Gaming Agency shall have authority to review during normal business hours, all records maintained by the Tribal gaming operation, provided, however that any information derived therefrom, shall be deemed confidential and proprietary financial information of the Tribe and shall not be disclosed to any third party.

"(c) Tribal Gaming Agency Notification. At the completion of any inspection or investigation by the State Gaming Agency, copies of the investigative report shall be forwarded to the Tribal Gaming Agency."

Section 6(e) of the compact provides:

"(e) Reporting to State Gaming Agency. The Tribal Gaming Agency shall forward copies of all completed investigation reports and final dispositions to the State Gaming Agency on a continuing basis. If requested by the Tribal Gaming Agency, the State Gaming Agency shall assist in any investigation initiated by the Tribal Gaming Agency, and provide other requested services to ensure proper compliance with the provisions of this Compact, Tribal Gaming Ordinances, laws of the Tribe, or applicable laws of the State."

The compact would thus create a State Gaming Agency. Such agency does not now exist and has never been authorized by the legislature. The duties undertaken will require the hiring, training, and supervision of new state employees. The legislature has not authorized such and the same has not been budgeted. A whole new function would be engrafted upon an existing agency, the Kansas Lottery (or some other agency if the Governor so designated).

Let us examine the creation of the Kansas Lottery and its function. The Kansas Lottery was established by the Kansas Lottery Act, K.S.A. 1991 Supp. 74-8701 *et seq.*

K.S.A. 1991 Supp. 74-8702(d) contains the following definition:

" 'Kansas lottery' means the state agency created by this act to operate a lottery or lotteries pursuant to this act."

K.S.A. 1991 Supp. 74-8703(a) provides:

"(a) There is hereby established an independent state agency to be called the Kansas lottery, the head of which shall be the executive director of the Kansas lottery. Under the supervision of the executive director, the Kansas lottery shall administer the state lottery as provided in this act. The overall management of the state lottery and control over the operation of its games shall rest solely with the Kansas lottery."

Serious problems are present. The legislature created and funded an agency to perform a specific task—to administer the state lottery. By the compact, the Governor is engrafting a new and separate function onto such agency, requiring new personnel, policies, and procedures.

Another major difficulty presents itself. Rules and regulations would be necessary to implement the new function.

Authority is delegated to the Kansas Lottery to adopt rules and regulations by K.S.A. 1991 Supp. 74-8710, which is set forth in pertinent part, as follows:

"The commission, upon the recommendation of the executive director, shall *adopt rules and regulations governing the establishment and operation of a state lottery as necessary to carry out the purposes of this act.* Temporary rules and regulations may be adopted by the commission without being subject to the provisions and requirements of K.S.A. 77-415 through 77-438, and amendments thereto, but shall be subject to approval by the attorney general as to legality and shall be filed with the secretary of state and published in the Kansas register." (Emphasis supplied.)

The delegation of power to adopt rules and regulations is limited to those necessary to carry out the purpose of the Act. Thus, no authority has been delegated to establish rules and regulations for the function of the State Gaming Agency which the compact states will be hitched to the Kansas Lottery.

K.S.A. 77-425 provides:

"Every rule and regulation other than a temporary rule and regulation which is filed by a state agency in the office of the secretary of state as provided in this act *shall have the force and effect of law* on and after the date prescribed in K.S.A. 77-426 . . . ." (Emphasis supplied.)

K.S.A. 77-420 sets forth the complex procedure for establishing rules and regulations. Every proposed rule and regulation must first be submitted to the Secretary of Administration for approval. If such approval is obtained, then the same has to be submitted to the Attorney General for approval. The statute then provides:

"(c) No rule and regulation shall be filed by the secretary of state unless:

(1) The organization, style, orthography and grammar have been approved by the secretary of administration;

(2) *the rule and regulation has been approved in writing by the attorney general as to legality*;

(3) *the attorney general finds that the making of such rule and regulation is within the authority conferred by law on the state agency submitting the same*;

(4) the rule and regulation has been formally adopted by the state agency after it has been approved by the secretary of administration and the attorney general and is accompanied by a certified or other formal statement of adoption when adoption is by an executive officer of a state agency, or by a certified copy of the roll call vote required for its adoption by K.S.A. 77-421, and amendments thereto, when adoption is by a board, commission, authority or other similar body;

(5) the rule and regulation to be filed is accompanied by a copy of the economic impact statement as provided by K.S.A. 77-416, and amendments thereto; and

(6) the rule and regulation is accompanied by a copy of any document which is adopted by reference by such rule and regulation unless specifically exempt by the state rules and regulations board pursuant to subsection (a) of K.S.A. 77-416, and amendments thereto." (Emphasis supplied.)

Our cases firmly establish that a state agency's power to adopt rules and regulations is a delegation of legislative authority. In *Gumbhir v. Kansas State Board of Pharmacy*, 228 Kan. 579, 618 P.2d 837 (1980), certain rules and regulations of the defendant

board were challenged on the basis that the legislature had improperly delegated its legislative power to a nongovernmental association. In Syl. ¶¶ 1-4 we stated:

"Under Article 2, Section 1 of the Constitution of the State of Kansas the legislative power of this state shall be vested in a house of representatives and senate." Syl. ¶ 1.

"An unlawful delegation of legislative power is contrary to the public policy expressed in the Constitution." Syl. ¶ 2.

"The legislature may enact general provisions for regulation and grant to *state agencies* certain discretion in filling in the details, provided it fixes reasonable and definite standards to govern the exercise of such authority." Syl. ¶ 3.

"The legislative power of this state is vested in the legislature and the legislature is prohibited from delegating legislative powers to *nongovernmental associations or groups*." Syl. ¶ 4.

See *Boswell, Inc. d/b/a Broadacres v. Harkins*, 230 Kan. 738, 740-41, 640 P.2d 1208 (1982).

The creation of the State Gaming Agency would, in effect, be the creation of a new state agency by the executive branch to perform a new function of Kansas government which was never authorized by the legislature. The creation of a state agency is clearly a legislative function and cannot be accomplished by the executive branch under the guise of merely adding a new function to an existing agency.

Other provisions in the compact are also clearly legislative in nature. Section 9(1) requires the Kansas Bureau of Investigation (KBI) to do a background investigation on each prospective gaming employee and provide a written report thereof to the tribe, the Tribal Gaming Agency, and the State Gaming Agency. A substantial new function is thus added to that agency. Further, neither the tribe nor the Tribal Gaming Agency are criminal justice agencies as defined by K.S.A. 1991 Supp. 22-4701(c) and the dissemination to them of any information contained in the criminal justice information system by the KBI could be violative of K.S.A. 22-4707.

Section 4(q) of the compact also provides that "Members of the Tribal Law Enforcement Agency shall attend the Kansas Law Enforcement Training Center or receive comparable training approved by the State Gaming Agency."

It is true that the compact provides that the tribe shall reimburse the State quarterly for expenses incurred by the State Gaming Agency and those of the KBI chargeable to the carrying out of its functions under the compact. This, however, has no bearing on the legislative-executive function issue.

The respondent Governor relies heavily on expediency as a basis for her authority to act herein. She contends that the State is required to negotiate with a tribe requesting same under IGRA and that the time restraints in IGRA make the Governor's office the only feasible party to such negotiations on behalf of the State. Any argument of expediency has a certain practical appeal. However, expediency cannot grant a power to the executive branch which the Kansas Constitution has denied it.

We find no constitutional impediment to the Governor's authority to enter into negotiations with the Kickapoo Nation. The power to bind the State to the compact is another matter.

## CONCLUSION

As previously discussed, many of the provisions in the compact would operate as the enactment of new laws and the amendment of existing laws. The Kansas Constitution grants such power exclusively to the legislative branch of government.

On the narrow issue presented, we conclude the Governor had the authority to enter into negotiations with the Kickapoo Nation, but, in the absence of an appropriate delegation of power by the Kansas Legislature or legislative approval of the compact, the Governor has no power to bind the State to the terms thereof.