904 P.2d 11

STATE of New Mexico ex rel. Guy
CLARK, Max Coll, and George
Buffett, Petitioners,

v.

The Hon. Gary JOHNSON, Governor
of the State of New Mexico,
Respondent.

No. 22861.

Supreme Court of New Mexico.

July 13, 1995.

Victor R. Marshall & Associates, P.C., Victor R. Marshall, Alexis H. Johnson, Albuquerque, for petitioners.

Sutin, Thayer & Browne, P.C., Jonathan B. Sutin, Albuquerque, for respondent.

*OPINION*

MINZNER, Justice.

Petitioners filed a verified petition for writ of mandamus or writ of prohibition and declaratory judgment from this Court directed at Respondent, who is the Governor of the State of New Mexico. Attached to the petition was a copy of the "Compact and Revenue Sharing Agreement" entered into by the Governor of New Mexico with the Governor of Pojoaque Pueblo. The petition alleges that the Governor of New Mexico has entered into similar compacts and revenue-sharing agreements with the Presidents of the Jicarilla and Mescalero Apache Tribes, as well as the Governors of Acoma, Isleta, Nambe, Sandia, Santa Ana, Santa Clara, San Felipe, San Ildefonso, San Juan, Taos, and Tesuque Pueblos pursuant to the Indian Gaming Regulatory Act (the Act or the IGRA). *See* 25 U.S.C.S. §§ 2701–2721 (Law.Co-op. Supp.1995).

Petitioners generally contend that the Governor of New Mexico lacked the authority to commit New Mexico to these compacts and agreements, because he attempted to exercise legislative authority contrary to the doctrine of separation of powers expressed in the state Constitution. *See* N.M. Const. art. III, § 1; *see also State ex rel. Stephan v. Finney,* 251 Kan. 559, 836 P.2d 1169 (1992) (per curiam) (*Finney I*). Petitioners sought an order that would preclude the Governor of New Mexico from implementing the compacts and revenue-sharing agreements he has signed. *Cf. State ex rel. Bird v. Apodaca,* 91 N.M. 279, 573 P.2d 213 (1977) (state highway engineer brought mandamus proceeding seeking an order directing the Governor to cease, desist, and refrain from removing or transferring petitioner or interfering with performance of his duties). This Court set the matter for hearing, *see* SCRA 1986, 12–504(C)(2) (Repl.Pamp.1992), but on motion of the Governor of New Mexico we vacated the original hearing date in order to give the Governor an opportunity to obtain counsel and to file a written response. After the Governor filed his response, Petitioners filed a brief, and the matter came before this Court for oral argument. Following oral argument, the matter was taken under advisement. *See* SCRA 12–504(C)(3)(d). Having determined that Petitioners' pleadings support an order granting a peremptory writ, we now grant that relief and explain our ruling. *See* SCRA 12–504(C)(3)(c).

*BACKGROUND*

Congress enacted the IGRA in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In *Cabazon Band,* the Supreme Court upheld an Indian tribe's right to conduct bingo games free from interference by the State of California. *Id.* The *Cabazon Band* decision rested on the principle that Indian tribes are sovereign entities and that federal law limits the applicability of state and local law to tribal Indians on reservations. *Id.* at 207, 107 S.Ct. at 1087. The IGRA also recognized the sovereign right of tribes to regulate gaming activity on Indian lands. However, with the IGRA, Congress attempted to strike a balance between the rights of tribes as sovereigns and the interests that states may have in regulating sophisticated forms of gambling. *See* S.Rep. No. 446, 100th Cong., 2d Sess. 13 (1988).

The IGRA establishes three classes of gambling: Class I gaming, social or ceremonial games; Class II gaming, bingo and similar games; and Class III gaming, all other gambling, including pari-mutuel horse racing, casino gaming, and electronic versions of Class II games. *Id.* at 3. The IGRA provides for a system of joint regulation of Class II gaming by tribes and the federal government and a system for compacts between tribes and states for regulation of Class III gaming. *See id.* at 13. The IGRA establishes a National Indian Gaming Commission as an independent agency with a regulatory role for Class II gaming and an oversight role with respect to Class III gaming. 25 U.S.C.S. §§ 2704, 2706. Under the IGRA, Class III gaming is lawful on Indian lands only if such activities are located in a state that "permits such gaming for any purpose by any person, organization, or entity, and [is] conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C.S. § 2710(d)(1).

The IGRA provides that an Indian tribe may request negotiations for a compact, and that upon receipt of such a request, a state must negotiate with the tribe in good faith. *See* 25 U.S.C.S. § 2710(d)(3)(A). If a state and a tribe fail after negotiation and then mediation to agree on a compact, the Secretary of the Interior is authorized to prescribe procedures that are consistent with the proposed compact selected by the mediator, the IGRA, and the laws of the state. *See* 25 U.S.C.S. § 2710(d)(7)(B)(vii)(I).

Litigation under the IGRA has resulted in a number of published opinions. These cases have arisen most frequently in federal court on suits brought by Indian tribes to compel negotiation. *See, e.g., Ponca Tribe of Oklahoma v. Oklahoma*, 37 F.3d 1422 (10th Cir.) (Indian tribes in New Mexico, Oklahoma, and Kansas sought injunctions requiring negotiation), *petition for cert. filed*, 63 U.S.L.W. 3477 (U.S. Dec. 9, 1994) (Nos. 94–1029 & 94–1030). In these cases, one issue has been the effect of the Tenth and Eleventh Amendments of the United States Constitution.

In *Ponca Tribe*, the Tenth Circuit affirmed district court decisions dismissing the tribes' suits against the Governors of Oklahoma and New Mexico. The Court of Appeals concluded that neither the Tenth nor the Eleventh Amendment barred the tribes' actions against the states, but determined that injunctive relief against the governors themselves was barred.

In light of our Tenth Amendment analysis, IGRA does not require the states to regulate Class III gaming by entering into tribal-state compacts. Instead, the only obligation on the state is to negotiate in good faith. The act of negotiating, however, is the epitome of a discretionary act. How the state negotiates; what it perceives to be its interests that must be preserved; where, if anywhere, that it can compromise its interests—these all involve acts of discretion. Thus, injunctive relief against the governors is barred under *Ex parte Young* [, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)] ....

Additionally, the tribes' suits against the Governors are in reality suits against the respective states and thus not authorized under the doctrine of *Ex parte Young*. *Id.* at 1436 (citations omitted).

In November 1994, Respondent was elected Governor of New Mexico and formally assumed office on January 1, 1995. As part of his transition team, he appointed a negotiator to meet with various Indian tribal representatives to develop compacts and revenue-sharing agreements. The negotiations were successful. An affidavit by the Governor of San Felipe Pueblo, attached to the response of the Governor of New Mexico, indicates that the compact he signed was circulated in draft form to the media and members of the state legislature. The earliest of the compacts is dated February 13; the latest is dated March 1. The Governor of New Mexico's response to the petition also indicates that the Secretary of the Interior approved eleven of the compacts on March 22, 1995. The petition was filed on April 20. Two additional compacts were approved effective May 15, 1995.

The compact with Pojoaque Pueblo is titled "A Compact Between the Pojoaque Pueblo and the State of New Mexico Providing for the Conduct of Class III Gaming." The Governor of New Mexico does not dispute that the compact and revenue sharing agreement with Pojoaque Pueblo are representative of the other compacts and agreements he signed. Because they are the only documents in the record, we will discuss them specifically, but also as illustrative of all the other compacts and agreements the Governor of New Mexico has signed.

The Recitals in the Compact include the following:

WHEREAS, the State permits charitable organizations to conduct all forms of gaming wherein, for consideration, the participants are given an opportunity to win a prize, the award of which is determined by chance, including but not limited to all forms of casino-style games, and others, pursuant to § 30–19–6, NMSA 1978 (1994 Repl.Pamp.); and

WHEREAS, the State also permits video pull-tabs and video bingo pursuant to §§ 60–2B–1 to –14, NMSA 1978 (1991 Repl.Pamp.), *Infinity Group, Inc. v. Man-*

*zagol,* 118 N.M. 632, 884 P.2d 523 (1994); and

WHEREAS, the State permits pari-mutuel wagering pursuant to § 60–1–1 to –26, NMSA 1978 (1991 Repl.Pamp.) and §§ 60–2D–1 to –18, NMSA 1978 (1991 Repl. Pamp.); and

WHEREAS, such forms of Class III Gaming are, therefore, permitted in the State within the meaning of the IGRA, 25 U.S.C. § 2710(d)(1)(B); and

. . . .

WHEREAS, a Compact between the Tribe and the State for the conduct of Class III Gaming on Indian Lands will satisfy the State's obligation to comply with federal law and fulfill the IGRA requirement for the lawful operation of Class III Gaming on the Indian Lands in New Mexico. . . .

The compact further provides as follows:

The Tribe may conduct, only on Indian Lands, subject to all of the terms and conditions of this Compact, any or all Class III Gaming, that, as of the date this Compact is signed by the Governor of the State is permitted within the State for any purpose by any person, organization or entity, such as is set forth in the Recitals to this Compact[.]

Other recitals describe the Governor's power to enter into the compact under the IGRA. They are:

WHEREAS, the Joint Powers Agreements Act, §§ 11–1–1 to –7, NMSA 1978 (1994 Repl.Pamp.), authorizes any two or more public agencies by agreement to jointly exercise any power common to the contracting parties (§ 11–1–3), and defined "public agency" to include Indian tribes and the State of New Mexico or any department or agency thereof (§ 11–1–2(A)); and

WHEREAS, the Mutual Aid Act, §§ 29–8–1 to –3, NMSA 1978 (1994 Repl.Pamp.), authorizes the State and any Indian tribe to enter into mutual aid agreements with respect to law enforcement; and

WHEREAS, Article V, § 4 of the Constitution of the State of New Mexico provides that "The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed."

These recitals indicate that in entering the compact, both the State and Tribal Governors believed that the Governor of New Mexico was authorized to bind the State of New Mexico with his signature. In challenging the Governor's actions, Petitioners have relied on the Kansas Supreme Court per curiam decision in *Finney I.* There the Kansas Supreme Court held that:

[M]any of the provisions in the compact would operate as the enactment of new laws and the amendment of existing laws. The Kansas Constitution grants such power exclusively to the legislative branch of government . . . we conclude the Governor had the authority to enter into negotiations with the Kickapoo Nation, but, in the absence of an appropriate delegation of power by the Kansas Legislature or legislative approval of the compact, the Governor has no power to bind the State to the terms thereof.

*Id.,* 836 P.2d at 1185. For the reasons that follow, we conclude that New Mexico law is similar.

*MANDAMUS*

We initially consider whether, in light of the procedural posture of this case, a writ of mandamus is an appropriate remedy. Specifically, we examine three subissues: (1) whether Petitioners have standing to bring this action; (2) whether this action is properly before this Court in an original proceeding; and (3) whether a prohibitive writ of mandamus will issue to enjoin a state official from acting or whether it will only issue to compel an official to act.

■ In the case of *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975 (1974), a state senator sought a writ of mandamus to compel the Governor and other officials to treat as void certain partial vetoes. In considering the petitioner's standing to bring that action, we said:

[I]t has been clearly and firmly established that even though a private party may not have standing to invoke the power of this

Court to resolve constitutional questions and enforce constitutional compliance, this Court, in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance.

*Id.* at 363, 524 P.2d at 979. Accordingly, we did not need to consider whether the petitioner's status as a legislator, taxpayer, or citizen conferred standing in that case. In the present proceeding, two of the Petitioners are state legislators, and all three are voters and taxpayers. However, as in *Sego,* we need not consider whether those factors independently confer standing to bring this action because, as in *Sego,* the issues presented are of "great public interest and importance." *Id.* Petitioners assert in the present proceeding that the Governor has exercised · the state legislature's authority. Their assertion presents issues of constitutional and fundamental importance; in resolving those issues, we will contribute to this State's definition of itself as sovereign. "We simply elect to confer standing on the basis of the importance of the public issues involved." *Id.* More limited notions of standing are not acceptable. *See id.; Hutcheson v. Gonzales,* 41 N.M. 474, 491–94, 71 P.2d 140, 151–52 (1937); *see generally* Charles T. DuMars & Michael B. Browde, *Mandamus in New Mexico,* 4 N.M.L.Rev. 155, 170–72 (1974). We conclude that Petitioners have standing.

▆ We next consider whether this case should more properly be brought in district court or whether it is properly before this Court in an original proceeding. Our state Constitution provides that this Court will "have original jurisdiction in quo warranto and mandamus against all state officers, boards and commissions." N.M. Const. art. VI, § 3. In seeming contradiction, NMSA 1978, Section 44–2–3 conveys upon the district court "exclusive original jurisdiction in all cases of mandamus." However, as one scholarly commentary has noted, this apparent conflict:

has never given rise to difficulty since the supreme court, irrespective of the statute, has regularly exercised original jurisdiction ... [and SCRA 12–504(B)(1)(b) ] has

given force and effect to the policy behind the statute, by requiring that an original petition which could have been brought in a lower court must set forth "the circumstances necessary or proper to seek the writ in the supreme court."

DuMars & Browde, *supra,* at 157 (quoting the predecessor to SCRA 1986, 12–504) (footnotes omitted). Such "circumstances" which justify bringing an original mandamus proceeding in this Court include "the possible inadequacy of other remedies and the necessity of an early decision on this question of great public importance." *Thompson v. Legislative Audit Comm'n,* 79 N.M. 693, 694–95, 448 P.2d 799, 800–01 (1968).

As we have said, this proceeding implicates fundamental constitutional questions of great public importance. Moreover, an early resolution of this dispute is desirable. The Governor asserts, and it has not been disputed, that several of the compacting tribes are in the process of establishing and building gambling resorts and casinos. These projects entail the investment of large sums of tribal money. Capital financing for these projects may well depend upon resolution of the issue presented in this case. Moreover, the relevant facts are virtually undisputed, we perceive no additional. factual questions that could be or should be answered in the district court, and the purely legal issues presented would have come eventually to this Court even if proceedings had been initiated in the district court. Accordingly, we conclude that the exercise of our original constitutional jurisdiction is appropriate in this case.

▆ The final procedural issue is whether mandamus, which normally lies to compel a government official to perform a non-discretionary act, is a proper remedy by which to enjoin ·the Governor from acting unconstitutionally. This Court has never "insisted upon ... a technical approach [to the application of mandamus] where there is involved a question of great public import," *Thompson,* 79 N.M. at 694, 448 P.2d at 800, and where other remedies might be inadequate to address that question.

Prohibitory mandamus may well have been a part of New Mexico jurisprudence even before statehood. One nineteenth century

New Mexico judge characterized the authority to prohibit unlawful official conduct as implicit in the nature of mandamus. In the case of *In re Sloan*, 5 N.M. 590, 25 P. 930 (1891), the district court enjoined a board of county commissioners from certifying certain candidates as winners of a contested election and ordered the board to instead certify other candidates. The Territorial Supreme Court upheld the district court's granting of both a writ of mandamus and injunctive relief. Justice Freeman wrote: "It is well settled that the two processes, mandamus and injunction, are correlative in their character and operation. As a rule, whenever a court will interpose by mandamus to compel the performance of a duty, it will exercise its restraining power to prevent a corresponding violation of duty." *Id.* at 628, 25 P. at 942 (Freeman, J., concurring). More recent cases illustrate Justice Freeman's insight. This Court on several occasions has recognized that mandamus is an appropriate means to prohibit unlawful or unconstitutional official action. *See Stanley v. Raton Bd. of Educ.*, 117 N.M. 717, 718, 876 P.2d 232, 233 (1994); *State .ex rel. Bird*, 91 N.M. at 282, 573 P.2d at 216; *State ex rel. Sego*, 86 N.M. at 363, 524 P.2d at 979; *State ex rel. State Bd. of Educ. v. Montoya*, 73 N.M. 162, 170, 386 P.2d 252, 258 (1963); *cf. McFadden v. Jordan*, 32 Cal.2d 330, 196 P.2d 787 (1948) (en banc) (issuing writ of mandamus to enjoin the secretary of state from submitting to the voters unconstitutional initiative proposal), *cert. denied*, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1080 (1949); *Leininger v. Alger*, 316 Mich. 644, 26 N.W.2d 348 (1947) (same); Iowa Code § 661.1 (1995) (defining mandamus as either mandatory or prohibitory). "Mandamus would necessarily lie if the Governor's actions were unconstitutional...." *State ex rel. Bird*, 91 N.M. at 288, 573 P.2d at 222 (Sosa, J., dissenting) (distinguishing *Sego* as involving an unconstitutional use of the Governor's veto power).

■ As the United States Supreme Court has observed, "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *INS v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 2781, 77 L.Ed.2d 317 (1983). Although it is not within the province of this Court to evaluate the wisdom of an act of either the legislature or the Governor, it certainly is our role to determine whether that act goes beyond the bounds established by our state Constitution. As we said in *State ex rel. Hovey Concrete Products Co. v. Mechem*, 63 N.M. 250, 252, 316 P.2d 1069, 1070 (1957), *overruled on other grounds by Wylie Corp. v. Mowrer*, 104 N.M. 751, 726 P.2d 1381 (1986):

> [D]eeply rooted in American Jurisprudence is the doctrine that state constitutions are not grants of power to the legislative, to the executive and to the judiciary, but are limitations on the powers of each. No branch of the state may add to, nor detract from its clear mandate. It is a function of the judiciary when its jurisdiction is properly invoked to measure the acts of the executive and the legislative branch solely by the yardstick of the constitution.

We conclude that Petitioners' arguments raise allegations that support the use of prohibitory mandamus.

## INDISPENSABLE PARTIES

■ The Governor has argued that the Tribes and Pueblos with whom he signed the compacts and agreements are indispensable parties to this proceeding. We disagree. In a mandamus case, a party is indispensable if the "performance of an act [to be compelled by the writ of mandamus is] dependent on the will of a third party, not before the court." *Chavez v. Baca*, 47 N.M. 471, 482, 144 P.2d 175, 182 (1943). That is not the case here. Petitioners seek a writ of mandamus against the Governor of New Mexico, not against any of the tribal officials. Resolution of this case requires only that we evaluate the Governor's authority under New Mexico law to enter into the compacts and agreements absent legislative authorization or ratification. Such authority cannot derive from the compact and agreement; it must derive from state law. This is not an action based on breach of contract, and its resolution does not require us to adjudicate the rights and obligations of the respective parties to the compact.

*GAMBLING IN NEW MEXICO AND 25 U.S.C.S. § 2710(d)(1)(B)*

As an alternative to their argument that the Governor lacked authority to enter into the compact, Petitioners assert that the disputed compact violates limitations in the IGRA on the permissible scope of any gaming compact. We address this argument first because an analysis of New Mexico's gambling laws, and the public policies expressed therein, is relevant to the question of whether the Governor has infringed legislative authority in signing the compacts.

Under the IGRA, Class III gaming activities are lawful on Indian lands only if such activities are conducted pursuant to a tribal-state compact and are "located in a State that permits *such gaming* for any purpose by any person, organization, or entity." 25 U.S.C.S. § 2710(d)(1)(B) (emphasis added). The Eighth and Ninth Circuits have interpreted "such gaming" to mean only those forms of gaming a state presently permits. *See Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 41 F.3d 421, 426 (9th Cir.1994); *Cheyenne River Sioux Tribe v. South Dakota,* 3 F.3d 273, 279 (8th Cir.1993). For example, in *Rumsey Indian Rancheria,* the Ninth Circuit Court of Appeals held that the IGRA does not require the state to negotiate regarding one form of Class III gaming activity because the state had legalized another, albeit similar form of gaming. A federal district court made a similar determination. *See Coeur D'Alene Tribe v. Idaho,* 842 F.Supp. 1268 (D.Idaho 1994), *aff'd,* 51 F.3d 876 (9th Cir.1995).

Petitioners argue that Section 2710(d)(1)(B) is not satisfied because the compact authorizes all forms of "casino-style" gaming. Although not stated in the compact, we assume this might include such games as blackjack and poker in all its forms, keno, baccarat, craps, roulette, or any other form of gambling wherein the award of a prize is determined by some combination of chance or skill. The Governor states that New Mexico permits charities to conduct all forms of gaming, including "casino-style" gaming, under the provisions of the permissive lottery exception to New Mexico's gambling laws.

*See* NMSA 1978, § 30–19–6 (Repl. Pamp.1994).

The question raised by Petitioners' argument is what forms of Class III gaming New Mexico "permits" within the meaning of 25 U.S.C.S. § 2710(d)(1)(B). This is ultimately a federal question. *See State of Kansas ex rel. Stephan v. Finney,* No. 93–4098-SAC, 1993 WL 192809 at *5 (D.Kan. May 12, 1993) (unpublished opinion). Nevertheless, it depends on an interpretation of New Mexico's gambling laws. *See State ex rel. Stephan v. Finney,* 254 Kan. 632, 867 P.2d 1034, 1038 (1994) (*Finney II*) (Kansas Supreme Court is proper forum to interpret use of term "lottery" in state constitution).

We do not agree with the Governor's broad assertion that any and all forms of "casino-style" gaming, such as the ones we have described, would be allowed under Section 30–19–6. This provision allows charitable and other non-profit organizations to operate a "lottery" twice a year, and requires that the revenue derived be used for the benefit of the organization or for public purposes. *Id.* Neither this Court nor the Court of Appeals has construed this provision in order to decide specifically what forms of gaming or gambling the legislature may have intended to allow under this provision, and we will not undertake the task of attempting to catalogue those games now. This question has not been specifically addressed by the parties, and indeed its resolution is unnecessary to our decision in this case.

It is true, as the Governor has asserted, that the statutory definition of a "lottery" in Article 19, Section 30 of the Criminal Code is extremely broad. "Lottery" is defined in the Criminal Code as "an enterprise wherein, for a consideration, the participants are given an opportunity to win a prize, the award of which is determined by chance, even though accompanied by some skill." NMSA 1978, § 30–19–1(C) (Repl.Pamp.1994). However, Section 30–19–6(D) states that "nothing" in Article 19, Chapter 30 of the Criminal Code applies to any "lottery" operated by tax exempt organizations. In addition, the exception to hold a lottery for charitable purposes would in no way exempt the organization involved from other prohibitions against

gambling in the Criminal Code. The general criminal prohibition against gambling in NMSA 1978, Section 30–19–2 (Repl. Pamp.1994), is applicable to both "making a bet" and participating in or conducting a lottery. Like the term "lottery," the term "bet" is also defined broadly as it relates to gambling. The term "bet" is defined as "a bargain in which the parties agree that, dependent upon chance, even though accompanied by some skill, one stands to win or lose anything of value specified in the agreement." Section 30–19–1(B).

We think that most of the forms of "casino-style" games we have described could just as easily fall within the definition and prohibition against "betting" as within the broad definition of "lottery." The question, as we see it, would be whether that form of gaming or gambling is more like "making a bet" or conducting or participating in a "lottery." If it was the former, the activity would still be illegal in all circumstances despite the effect of the permissive lottery statute.[1]

Moreover, we think the term "lottery" as used in Section 30–19–6 should not receive an expansive definition and should be narrowly construed. New Mexico law has unequivocally declared that all *for-profit* gambling is illegal and prohibited, except for licensed pari-mutuel horse racing. *See* NMSA 1978, § 30–19–3 (Repl.Pamp.1994); NMSA 1978, § 60–1–10 (Repl.Pamp.1991). New Mexico has expressed a strong public policy against for-profit gambling by criminalizing all such gambling with the exception of licensed pari-mutuel horse racing. *See* § 30–19–3. The permissive lotteries allowed by Section 30–19–6 include church fair drawings, movie theater prize drawings, and county fair livestock prizes, as well as the twice-a-year provision for nonprofit organizations on which the Governor's argument depends. We think that

any expansive construction of the term "lottery" in Section 30–19–6 that would authorize any of these organizations to engage in a full range of "casino-style" gaming would be contrary to the legislature's general public policy against gambling. We note that the Court of Appeals for similar reasons has rejected a broad definition of "raffles" under the Bingo and Raffle Act, NMSA 1978, §§ 60–2B–1 to –14 (Repl.Pamp.1991). *State ex rel. Rodriguez v. American Legion Post No. 99*, 106 N.M. 784, 786–88, 750 P.2d 1110, 1112–14 (Ct.App.), *cert. denied*, 106 N.M. 588, 746 P.2d 1120 (1987), *and cert. denied*, 107 N.M. 16, 751 P.2d 700 (1988); *see also American Legion Post No. 49 v. Hughes*, 120 N.M. 255, 259–60, 901 P.2d 186, 190–91 (Ct.App.1994) (rejecting broad construction of "game of chance" under the Bingo and Raffle Act), *cert. granted*, 119 N.M. 389, 890 P.2d 1321 (1995).

We have no doubt that the compact and agreement authorizes more forms of gaming than New Mexico law permits under any set of circumstances. We need not decide which forms New Mexico permits. The legislature of this State has unequivocally expressed a public policy against unrestricted gaming, and the Governor has taken a course contrary to that expressed policy. That fact is relevant in evaluating his authority to enter into the compacts and revenue-sharing agreements. Further, even if our laws allowed under some circumstances what the compact terms "casino-style" gaming, we conclude that the Governor of New Mexico negotiated and executed a tribal-state compact that exceeded his authority as chief executive officer. To reach this conclusion, we first consider the separation of powers doctrine and then consider the general nature of the Pojoaque compact as representative of all of the compacts the Governor of New Mexico signed.

---

1. The legislature appears to have intended to make these two categories, betting versus lotteries, mutually exclusive; a lottery is specifically excluded from the definition of betting. *See* § 30–19–1(B)(3). Thus, a particular form of gaming or gambling would necessarily fall under one or the other of these definitions. In most cases involving the prosecution of illegal gambling whether the activity was considered "mak-

ing a bet" or participating in a "lottery" would be unimportant; both represent criminal activity, and they are treated equally under the law. *See* NMSA 1978, §§ 30–19–2 & –3 (Repl.Pamp.1994). However, in attempting to categorize what form of gaming was allowable under the permissive lottery exception we would be required to decide whether a particular form of gaming fell into one category or the other.

## SEPARATION OF POWERS UNDER THE NEW MEXICO CONSTITUTION

■ The New Mexico Constitution vests the legislative power in the legislature, N.M. Const. art. IV, § 1, and the executive power in the governor and six other elected officials, *id.* art. V, § 1. The Constitution also explicitly provides for the separation of governmental powers:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted....

N.M. Const. art. III, § 1. This provision reflects a principle that is fundamental in the structure of the federal government and the governments of all fifty states. The doctrine of separation of powers rests on the notion that the accumulation of too much power in one governmental entity presents a threat to liberty. *See Gregory v. Ashcroft*, 501 U.S. 452, 459, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991). James Madison expressed this sentiment more than two hundred years ago when he wrote, "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." 1 Alexander Hamilton, James Madison & John Jay, *The Federalist, A Commentary on the Constitution of the United States* No. XLVII, at 329 (1901 ed.).

■ Despite the strict language of Article III, Section 1, this Court has previously said that "[t]he constitutional doctrine of separation of powers allows some overlap in the exercise of governmental function." *Mowrer v. Rusk*, 95 N.M. 48, 53, 618 P.2d 886, 891 (1980). This common sense approach recognizes that the absolute separation of governmental functions is neither desirable nor realistic. As one state court has said, separation of powers doctrine "does not mean an absolute separation of functions; for, if it did,

it would really mean that we are to have no government." *Sabre v. Rutland R. Co.*, 86 Vt. 347, 85 A. 693, 699 (1913). Recognizing, as a practical matter, that there cannot be absolute compartmentalization of the legislative, executive, and judicial functions among the respective branches, we must nevertheless give effect to Article III, Section 1. Accordingly, we have not been reluctant to intervene when one branch of government unduly "interfere[d] with or encroach[ed] on the authority or within the province of" a coordinate branch of government. *Mowrer*, 95 N.M. at 54, 618 P.2d at 892 (quoting *Smith v. Miller*, 153 Colo. 35, 384 P.2d 738, 741 (1963)).

This Court has previously held that Article III, Section 1 mandates that it is the Legislature that creates the law, and the Governor's proper role is the execution of the laws. *State v. Fifth Judicial Dist. Court*, 36 N.M. 151, 153, 9 P.2d 691, 692 (1932); *see also State v. Armstrong*, 31 N.M. 220, 255, 243 P. 333, 347 (1924) (recognizing that the Legislature has "the sole power of enacting law"). Our task, then, is to classify the Governor's actions in entering into the gaming compacts. Although the executive, legislative, and judicial powers are not " 'hermetically' sealed," they are nonetheless "functionally identifiable" one from another. *Chadha*, 462 U.S. at 951, 103 S.Ct. at 2784. If the entry into the compacts reasonably can be viewed as the execution of law, we would have no difficulty recognizing the attempt as within the Governor's authority as the State's chief executive officer. If, on the other hand, his actions in fact conflict with or infringe upon what is the essence of legislative authority—the making of law—then the Governor has exceeded his authority.

## APPLICATION OF THE DOCTRINE OF SEPARATION OF POWERS TO THE COMPACT WITH POJOAQUE PUEBLO

■ The Governor may not exercise power that as a matter of state constitutional law infringes on the power properly belonging to the legislature. We have no doubt that the compact with Pojoaque Pueblo does not execute existing New Mexico statutory or case law, but that it is instead an attempt to create new law. *Cf. Texas v. New Mexico,*

462 U.S. 554, 564, 103 S.Ct. 2558, 2565, 77 L.Ed.2d 1 (1983) (holding that, upon approval by Congress, a compact between states becomes federal law that binds the states); *West Virginia ex rel. Dyer v. Sims,* 341 U.S. 22, 28, 71 S.Ct. 557, 560–561, 95 L.Ed. 713 (1951) (characterizing an interstate compact as a "legislative means" by which states resolve interstate dispute). However, that in itself is not dispositive. The test is whether the Governor's action disrupts the proper balance between the executive and legislative branches. *See Board of Educ. v. Harrell,* 118 N.M. 470, 484, 882 P.2d 511, 525 (1994). In *Nixon v. Administrator of General Servs.,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977), the United States Supreme Court said:

> [I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which [the action by one branch prevents another branch] from accomplishing its constitutionally assigned functions. *United States v. Nixon,* 418 U.S. at 711–12 [94 S.Ct. at 3109–10]. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress. *Ibid.*

*Id.* (citation omitted). One mark of undue disruption would be an attempt to foreclose legislative action in areas where legislative authority is undisputed. The Governor's present authority could not preclude future legislative action, and he could not execute an agreement that foreclosed inconsistent legislative action or precluded the application of such legislation to the agreement. The compact with Pojoaque Pueblo and those of which it is representative cannot be said to be consistent with these principles.

■ The terms of the compact with Pojoaque Pueblo give the Tribe a virtually irrevocable and seemingly perpetual right to conduct any form of Class III gaming permitted in New Mexico on the date the Governor signed the agreement. *See* Compact Between the Pojoaque Pueblo and the State of New Mexico, at 4. Arguably, even legislative change could not affect the Tribe's ability to conduct Class III gaming authorized under the original compact. The compact is binding on the State of New Mexico for fifteen years, and it is automatically renewed for additional five-year periods unless it has been terminated by mutual agreement. *Id.* at 27. Any action by the State to amend or repeal its laws that had the effect of restricting the scope of Indian gaming, or even the attempt to directly or indirectly restrict the scope of such gaming, terminates the Tribe's obligation to make payments to the State of New Mexico under the revenue-sharing agreement separately entered into between the Governor and Pojoaque Pueblo. *See* Tribal–State Revenue Sharing Agreement, ¶ 5(A).[2]

We also find the Governor's action to be disruptive of legislative authority because the compact strikes a detailed and specific balance between the respective roles of the State and the Tribe in such important matters as the regulation of Class III gaming activities, the licensing of its operators, and the respective civil and criminal jurisdictions of the State and the Tribe necessary for the enforcement of state or tribal laws or regulations. All of this has occurred in the absence of *any* action on the part of the legislature. While negotiations between states and Indian tribes to address these matters is expressly contemplated under the IGRA, *see* 25 U.S.C.S. § 2710(d)(3)(C), we think the actual balance that is struck represents a legislative function. While the legislature might authorize the Governor to enter into a gaming compact or ratify his actions with respect to a compact he has negotiated, the Governor cannot enter into such a compact solely on his own authority.

Moreover, it is undisputed that New Mexico's legislature possesses the authority to prohibit or regulate all aspects of gambling on non-Indian lands. Pursuant to this authority, our legislature has, with narrow exceptions, made for-profit gambling a felony,

---

**2.** Under this agreement, three to five percent of the "net win" derived from Class III gaming on the Pojoaque Pueblo would be paid to the State of New Mexico and divided between state and local government.

and thereby expressed a general repugnance to this activity. Section 30–19–3. Whether or not the legislature, if given an opportunity to address the issue of the various gaming compacts, would favor a more restrictive approach consistent with its actions in the past constitutes a legislative policy decision. The compact signed by the Governor, on the other hand, authorizes Pojoaque Pueblo to conduct "all forms of casino-style games"; that is, virtually any form of commercial gambling. By entering into such a permissive compact with Pojoaque Pueblo and other Indian leaders, we think that the Governor contravened the legislature's expressed aversion to commercial gambling and exceeded his authority as this State's chief executive officer.

Our conclusion that the Governor lacks authority to enter into the disputed compacts gains support from Justice Robert H. Jackson's concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634–55, 72 S.Ct. 863, 869–80, 96 L.Ed. 1153 (1952). In that case, the Supreme Court faced the issue of whether President Truman had exceeded his constitutional authority by issuing an executive order directing the Secretary of Commerce to assume control of a number of steel mills. The President issued this order during the Korean War when the mills became incapacitated by a labor dispute. President Truman justified the seizure on the grounds that (1) he was the commander in chief of the armed forces, and (2) various statutes gave the President special emergency war powers. The Court struck down the President's action, holding that it was beyond the scope of Presidential authority. *Id.* at 589, 72 S.Ct. at 867–68. Noting that the seizure was contrary to the will of Congress, Justice Jackson wrote in a famous concurring opinion:

When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting on the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Id.* at 637–38, 72 S.Ct. at 871 (Jackson, J., concurring) (footnote omitted).

Since 1923, the State of New Mexico has entered into at least twenty-two different compacts with other sovereign entities, including the United States and other states.[3] These agreements encompass such widely diverse governmental purposes as interstate water usage and cooperation on higher education. In every case, New Mexico entered into the compact with the enactment of a statute by the legislature. Apart from nondiscretionary ministerial duties,[4] the Governor's role in the compact approval process has heretofore been limited to approving or vetoing[5] the legislation that approves the compact. This is the Governor's role with respect to all legislation passed by the legislature. *See* N.M. Const. art. IV, § 22.

Residual governmental authority should rest with the legislative branch rather than the executive branch. The state legislature, directly representative of the people, has broad plenary powers. If a state constitution is silent on a particular issue, the legislature should be the body of government to address the issue. *See Clinton v. Clinton*, 305 Ark. 585, 810 S.W.2d 923, 926 (1991). *Cf. Fair Sch. Fin. Council v. State*, 746 P.2d

---

**3.** Appendix A includes a listing of these compacts.

**4.** For example, the legislation whereby New Mexico entered into an interstate compact regarding parole and probation provided: "The Governor of this state is hereby authorized and directed to execute a compact on behalf of the State of New Mexico ... in the form substantially as follows...." 1937 N.M.Laws ch. 10, § 1.

**5.** The Governor of New Mexico has vetoed at least one interstate compact. In 1925, the governor vetoed the Pecos River Compact after it had been approved by the legislatures of Texas and New Mexico. *See* Letter from A.T. Hannett, Governor, to the New Mexico Senate (March 14, 1925) (reprinted in *Senate Journal of the Seventh Legislature* 423 (1925)).

1135, 1149 (Okla.1987) (under state constitution, a legislature may generally do "all but that which it is prohibited from doing"); *State ex inf. Danforth v. Merrell,* 530 S.W.2d 209, 213 (Mo.1975) (en banc) (state legislature "has the power to enact any law not prohibited by the constitution"); *House Speaker v. Governor,* 195 Mich.App. 376, 491 N.W.2d 832, 839 (1992) ("Any legislative power that the Governor possesses must be expressly granted to him by the constitution."). We conclude that the Governor lacked authority under the state Constitution to bind the State by unilaterally entering into the compacts and revenue-sharing agreements in question.

*NEW MEXICO STATUTORY AUTHORITY*

■ In *Willis v. Fordice,* 850 F.Supp. 523 (S.D.Miss.1994), *aff'd,* 55 F.3d 633 (1995) (No. 94–60299), the court upheld the governor's authority to enter into a gaming compact. There, however, the court specifically relied on a Mississippi statute that provides the governor with authority to transact " 'all the business of the state ... with any other state or territory.' " *Id.* at 532 (quoting Miss.Code Ann. § 7–1–13 (1972)). New Mexico has no such statute. In fact, in this case the Governor relies primarily on Article V, Section 4 of the New Mexico Constitution, which provides only that the governor shall *execute* the laws. To the extent that the Governor does rely on statutory authority, his reliance is misplaced.

■ An analysis of the Joint Powers Agreement Act, NMSA 1978, §§ 11–1–1 to – 7 (Repl.Pamp.1994), indicates that that statute does not enlarge the Governor's authority in the manner that he urges. That statute authorizes "public agencies" to enter into "agreements" with other public agencies. *Id.* § 11–1–3. The statute defines a "public agency" as "the federal government or any federal department or agency, this state, an adjoining state or any state department or agency, an Indian tribe or pueblo, a county, municipality, public corporation or public dis-

trict of this state or ... any school district...." *Id.* § 11–1–2(A). The Governor's claim of authority seems to be premised upon the notion that he is a "state department or agency" within the meaning of this statute.[6] This claim is untenable. To be sure, the Joint Powers Agreement Act does authorize an agreement between the State and a sovereign Indian tribe. However, the statute expressly requires that such an agreement must be "authorized by [the public agency's] legislative or other governing bod[y]." *Id.* § 11–1–3. This language plainly mandates that the legislature must approve any agreement to which the State is a party. The statute expressly disclaims any enlargement of the authority of public agencies when it provides that agreements executed thereunder are "subject to any constitutional or legislative restriction imposed upon any of the contracting public agencies." *Id.* § 11–1–2(B). We conclude that the Joint Powers Agreement Act does not provide authority for the compacts and revenue-sharing agreements at issue.

■ Likewise, the Mutual Aid Act, NMSA 1978, §§ 29–8–1 to –3 (Repl. Pamp.1994), does not provide authority for the compacts and revenue-sharing agreements. That statute does authorize tribal-state agreements; however, the scope of the statute is confined to "agreements ... with respect to law enforcement." *Id.* § 29–8–3. It is true that the compacts have some provisions regarding law enforcement, but this fact does not bring all of the terms within the scope of the Mutual Aid Act. The authority of an executive acting pursuant to a legislative grant of authority is limited to the express or implied terms of that grant. *See Worthington v. Fauver,* 88 N.J. 183, 440 A.2d 1128, 1140 (1982). *Cf. Rivas v. Board of Cosmetologists,* 101 N.M. 592, 593, 686 P.2d 934, 935 (1984) (an executive agency cannot promulgate a regulation that is beyond the scope of its statutory authority); *State ex rel. Lee v. Hartman,* 69 N.M. 419, 426, 367 P.2d 918, 923 (1961) (holding that a delegation of

---

6. The list includes neither the Governor nor executive officers. Application of the principle of *expressio unius est exclusio alterius* supports the conclusion that the framers of this statute did not

intend to include the Governor as a "public agency." *See Bettini v. City of Las Cruces,* 82 N.M. 633, 635, 485 P.2d 967, 969 (1971).

authority by the legislature must be express and provide clear statutory standards to guide the delegee). The Mutual Aid Act does not in any way pertain to gaming compacts and provides no statutory basis for the compact with Pojoaque Pueblo.

## APPLICABILITY OF FEDERAL LAW

■ The Governor argues that even if he lacked the authority under state law to enter into the compact, it is nonetheless binding upon the State of New Mexico as a matter of federal law. Along these same lines, he also argues that he possesses the authority, as a matter of *federal law,* to bind the State to the terms of the compact, irrespective of whether he has the authority as a matter of state law. We find the Governor's argument on these points to be inconsistent with core principles of federalism. The Governor has only such authority as is given to him by our state Constitution and statutes enacted pursuant to it. *Cf. Rapp v. Carey,* 44 N.Y.2d 157, 404 N.Y.S.2d 565, 375 N.E.2d 745, 750 (1978) (holding that the governor of New York "has only those powers delegated to him by the [state] Constitution and the statutes"). We do not agree that Congress, in enacting the IGRA, sought to invest state governors with powers in excess of those that the governors. possess under state law. Moreover, we are confident that the United States Supreme Court would reject any such attempt by Congress to enlarge state gubernatorial power. *Cf. Gregory,* 501 U.S. at 460, 111 S.Ct. at 2400 (recognizing that "[t]hrough the structure of its government ... a State defines itself as a sovereign"); *New York v. United States,* 505 U.S. 144, 176, 112 S.Ct. 2408, 2428, 120 L.Ed.2d 120 (1992) (striking down an act of Congress on the ground that principles of federalism will not permit Congress to " 'commandeer[ ] the legislative processes of the States' " by directly compelling the states to act (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981))); *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (striking down federal school gun ban on the ground that it is not substantially related to interstate commerce, and therefore unconstitutionally usurps state sovereignty).

We entertain no doubts that Congress could, if it so desired, enact legislation legalizing all forms of gambling on all Indian lands in whatever state they may occur. *See Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2483–84, 41 L.Ed.2d 290 (1974). That is, however, not the course that Congress chose. Rather, Congress sought to give the states a role in the process. *See* S.Rep. No. 446, 100th Cong., 2d Sess. 13. It did so by permitting Class III gaming only on those Indian lands where a negotiated compact is in effect between the state and the tribe. 25 U.S.C.S. § 2710(d)(1)(C). To this end, the language of the IGRA provides that "Any State ... may enter into a Tribal–State compact governing gaming activities on the Indian lands of the Indian Tribe." *Id.* § 2710(d)(3)(B). The only reasonable interpretation of this language is that it authorizes state officials, acting pursuant to their authority held under state law, to enter into gaming compacts on behalf of the state. It follows that because the Governor lacked authority under New Mexico law to enter into the compact with Pojoaque Pueblo, the State of New Mexico has not yet entered into any gaming compact that the Governor may implement. *Cf. Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176–79, 2 L.Ed. 60 (1803) (holding that an unconstitutional act of Congress has no legal effect).

## CONCLUSION

Under federal law as expressed in the IGRA, Class III gaming activities are lawful on Indian land only if the State permits such gaming "for any purpose by any person, organization, or entity." The compacts negotiated and signed by the Governor authorize gaming that New Mexico law does not permit. For example, New Mexico law does not permit "all forms of casino-style games" as stated in the recitals in the compact with Pojoaque Pueblo.

In addition, the New Mexico Constitution requires legislative approval or ratification of compacts that are otherwise in conflict with state gambling statutes. Under state constitutional separation of powers, the Governor may neither infringe upon legislative authority with respect to existing law nor with re-

spect to the power of the legislature to change law in the future. Residual governmental power rests within the legislature. The specific enabling legislation on which the Governor relies is not applicable.

The IGRA does not purport to expand state gubernatorial power. The Governor's power to negotiate and sign the compacts derives from the state constitution and state statutes.

Based on our interpretation of state gambling laws as making casino-style gaming illegal, state constitutional law as limiting the authority of the executive branch, and the IGRA as not purporting to expand state gubernatorial power, we conclude that the compacts executed by the Governor are without legal effect and that no gaming compacts exist between the Tribes and Pueblos and the State of New Mexico. Thus New Mexico has not entered into any gaming compact that either the Governor or any other state official may implement.

For these reasons we now issue the peremptory writ and stay. We stay all actions to enforce, implement, or enable any and all of the gaming compacts and revenue-sharing agreements executed by the Governor, and we direct the Governor and all other state officials subject to his authority to proceed in conformity with the views of this Court expressed herein concerning (1) the legality of casino-style gaming; (2) the limitations imposed on the executive branch by Article III, Section 1 of the New Mexico Constitution; and (3) the compacts' lack of legal effect.

IT IS SO ORDERED.

BACA, C.J., RAMSOM and FRANCHINI, JJ., and DONNELLY, J., court of appeals, sitting by designation, concur.

### APPENDIX A: INTERSTATE COMPACTS

1. 1923 N.M.Laws, ch. 6, § 1 (now codified at NMSA 1978, § 72–15–5 (Repl. Pamp.1985)). Colorado River Compact.

2. 1923 N.M.Laws, ch. 7, § 1 (now codified at NMSA 1978, § 72–15–16 (Repl. Pamp.1985)). La Plata River Compact.

### APPENDIX A: INTERSTATE COMPACTS—Continued

3. 1933 N.M.Laws, ch. 166 (now codified at NMSA 1978, § 72–15–19 (Repl. Pamp.1985)). Pecos River Compact. (*See Texas v. New Mexico,* 462 U.S. 554 (1983)).

4. 1937 N.M.Laws, ch. 10, § 1 (now codified at NMSA 1978, § 31–5–1 (Repl. Pamp.1984)). Compact Relating to Convicts on Probation or Parole.

5. 1939 N.M.Laws, ch. 33, § 1 (now codified at NMSA 1978, § 72–15–23 (Repl. Pamp.1985)). Rio Grande Compact.

6. 1945 N.M.Laws, ch. 51, § 1 (now codified at NMSA 1978, § 72–15–10 (Repl. Pamp.1985)). Costilla Creek Compact.

7. 1949 N.M.Laws, ch. 5, § 1 (now codified at NMSA 1978, § 72–15–26 (Repl. Pamp.1985)). Upper Colorado River Basin Compact.

8. 1951 N.M.Laws, ch. 4, § 1 (now codified at NMSA 1978, § 72–15–2 (Repl. Pamp.1985)). Canadian River Compact.

9. 1951 N.M.Laws, ch. 138, § 3 (now codified at NMSA 1978, § 11–10–1 (Repl. Pamp.1994)). Compact for Western Regional Cooperation in Higher Education.

10. 1959 N.M.Laws, ch. 112, § 1 (now codified at NMSA 1978, § 31–5–4 (Repl. Pamp.1984)). Western Interstate Corrections Compact.

11. 1967 N.M.Laws, ch. 201, § 2 (now codified at NMSA 1978, § 31–5–10 (Repl. Pamp.1984)). Interstate Compact on Mentally Disordered Offenders.

12. 1969 N.M.Laws, ch. 20, § 2 (now codified at NMSA 1978, § 18–2–20 (Repl. Pamp.1991)). Interstate Library Compact.

13. 1969 N.M.Laws, ch. 40, § 1 (now codified at NMSA 1978, § 11–9–1 (Repl. Pamp.1994)). Western Interstate Nuclear Compact.

14. 1969 N.M.Laws, ch. 57, § 1 (now codified at NMSA 1978, § 72–15–1 (Repl. Pamp.1985)). Animas–La Plata Project Compact.

15. 1971 N.M.Laws, ch. 270, § 1 (now codified at NMSA 1978, § 31–5–12 (Repl. Pamp.1984)). Agreement on Detainers.

16. 1972 N.M.Laws, ch. 19, § 1 (now codified at NMSA 1978, § 16–5–1 (Repl. Pamp.1987)). Cumbres and Toltec Scenic Railroad Compact.

*APPENDIX A: INTERSTATE COMPACTS*—Continued

17. 1973 N.M.Laws, ch. 238, § 2 (now codified at NMSA 1978, § 32A–10–1 (Repl. Pamp.1993)). Interstate Compact on Juveniles.

18. 1977 N.M.Laws, ch. 151, § 2 (now codified at NMSA 1978, § 32A–11–1 (Repl. Pamp.1993)). Interstate Compact on the Placement of Children.

19. 1982 N.M.Laws, ch. 89, § 1 (now codified at NMSA 1978, § 11–11–1 (Repl. Pamp.1994)). Interstate Mining Compact.

20. 1983 N.M.Laws, ch. 20, § 2 (now codified at NMSA 1978, § 11–9A–2 (Repl. Pamp.1994)). Rocky Mountain Low–Level Radioactive Waste Compact.

21. 1985 N.M.Laws, ch. 133, § 1 (now codified at NMSA 1978, § 40–7B–1 (Repl. Pamp.1994)). Interstate Compact on Adoption and Medical Assistance.

22. 1987 N.M.Laws, ch. 239, § 1 (now codified at NMSA 1978, § 11–12–1 (Repl. Pamp.1994)). Interstate Compact on Agricultural Grain Marketing.