CANTERO, J.
After almost sixteen years of sporadic negotiations with four governors, in November 2007 the Seminole Indian Tribe of Florida signed a gambling “compact” (a contract between two sovereigns) with Florida Governor Charles Crist. The compact significantly expands casino gambling, also known as “gaming,” on tribal lands. For example, it permits card games such as blackjack and baccarat that are otherwise prohibited by law. In return, the compact promises substantial remuneration to the State.
The Florida Legislature did not authorize the Governor to negotiate the compact before it was signed and has not ratified it since. To the contrary, shortly after the compact was signed, the Florida House of Representatives and its Speaker, Marco Rubio, filed in this Court a petition for a writ of quo warranto disputing the Governor’s authority to bind the State to the compact. We have exercised our discretion to consider such petitions, see art. V, § 3(b)(8), Fla. Const., and now grant it on narrow grounds. We hold that the Governor does not have the constitutional authority to bind the State to a gaming compact that clearly departs from the State’s public policy by legalizing types of gaming that are illegal everywhere else in the state.
In the remainder of this opinion, we describe the history of Indian gaming compacts in general and the negotiations leading up to the compact at issue. We then explain our jurisdiction to consider the petition. Finally, we discuss the applicable constitutional provisions, statutes, and cases governing our decision.
I. THE FACTUAL AND LEGAL BACKGROUND
We analyze the compact in the context of the federal regulations authorizing it as well as the background of the negotiations in this case. We first review the statutory foundation for the compact: the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 (2000) (IGRA). Next, we detail the history of the Tribe’s attempts to negotiate a compact with the State. Finally, we explain the compact’s relevant terms.
A. IGRA
Indian tribes are independent sovereigns. The Indian Commerce Clause of the United States Constitution grants only Congress the power to override their sovereignty on Indian lands. U.S. Const., art. I, § 8, cl. 3 (“The Congress shall have Power ... [t]o regulate Commerce with ... the Indian Tribes.”); see also California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (noting that tribal sovereignty is subordinate only to the federal government). Before IGRA, states had no role in regulating Indian gaming. See Cabazon, 480 U.S. at 202, 107 S.Ct. 1083.
Congress enacted IGRA in 1988. Among other things, the statute provides “a statutory basis for the operation of *1039 gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments.” 25 U.S.C. § 2702(1). IGRA divides gaming into three classes: Class I includes “social games solely for prizes of minimal value.” Id. § 2703(6). Class II includes “the game of chance commonly known as bingo” and “non-banked” card games — that is, games in which participants play against only each other; the host facility (the “house”) has no stake in the outcome. Id. § 2703(7). Class III— the only type relevant here — comprises all other types of gaming, including slot machines, pari-mutuel wagering (such as horse and greyhound racing), lotteries, and “banked” card games — such as baccarat, blackjack (twenty-one), and chemin de fer — in which participants play against the house. Id. § 2703(6)-(8).
IGRA permits Class III gaming on tribal lands, but only in limited circumstances. It is lawful only if it is (1) authorized by tribal ordinance, (2) “located in a State that permits such gaming for any purpose by any person, organization, or entity,” and (3) “conducted in accordance with a Tribal-State compact entered into by the Indian tribe and the State ... that is in effect.” Id. § 2710(d)(1) (emphasis added).
IGRA provides for tribes to negotiate compacts with their host states. Upon a tribe’s request, a state “shall negotiate with the Indian tribe in good faith to enter into such a compact.” Id. § 2710(d)(3)(A) (emphasis added). If the parties successfully negotiate a compact and the Secretary of the Department of the Interior (Department) approves it, the compact takes effect “when notice of approval by the Secretary” is published in the Federal Register. Id. § 2710(d)(3)(B), (8).
If negotiations fail, IGRA allows a tribe to sue the state in federal court. If the state continues to refuse consent, the Secretary may “prescribe ... procedures” permitting Class III gaming. See id. § 2710(d)(7)(B)(vii). The United States Supreme Court has held, however — in a case involving the Seminole Tribe’s attempts to offer Class III gaming in Florida — that IGRA did not abrogate the states’ Eleventh Amendment immunity. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 47, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Therefore, states need not consent to such lawsuits. The Department later created an alternative procedure under which, when a tribe cannot negotiate a compact and a state asserts immunity, the Secretary may prescribe Class III gaming. See Class III Gaming Procedures, 64 Fed. Reg. 17535-02 (Apr. 12, 1999) (codified at 25 C.F.R. pt. 291 (2007)). At least one federal court, however, has held that the Secretary lacked authority to promulgate such regulations. See Texas v. United States, 497 F.3d 491, 493 (5th Cir.2007), petition for cert, filed sub nom. Kickapoo Traditional Tribe of Texas v. Texas, 76 U.S.L.W. 3471 (U.S. Feb. 25, 2008) (No. 07-1109). Therefore, their validity remains questionable.
B. The Negotiations Between the Tribe and the State
With this statutory framework in mind, we briefly describe the protracted history of the Seminole Tribe’s efforts to negotiate a compact for conducting Class III gaming in Florida. These negotiations spanned sixteen years and four different governors.
The Seminole Indian Tribe is a federally recognized Indian tribe whose reservations and trust lands are located in the State. The Tribe currently operates Class II gaming facilities, offering low stakes poker games and electronically aided bingo games. The Tribe first sought a compact allowing it to offer Class III gaming in 1991. That January, the Tribe and Governor Lawton Chiles began negotiations, but *1040 they ultimately proved fruitless. That same year, the Tribe filed suit in federal court alleging that the State had failed to negotiate in good faith. As noted earlier, the Supreme Court ultimately ruled that the State could assert immunity, and it did. See Seminole Tribe, 517 U.S. at 47, 116 S.Ct. 1114, aff'g Seminole Tribe of Fla. v. Fla., 11 F.3d 1016 (11th Cir.1994).
Over the next several years, the Tribe repeatedly petitioned the Department to establish Class III gaming procedures. In 1999, the Department did so. It found the Tribe eligible for the procedures and called an informal conference, which was held in Tallahassee that December. At the State’s suggestion, however, the Tribe agreed to suspend the conference, though only temporarily. In January 2001, the Secretary issued a twenty-page decision allowing the Tribe to offer a wide range of Class III games. When the State requested clarification, however, the Secretary withdrew the decision. The delay continued. Finally, five years later — in May 2006 — the Department reconvened the conference in Hollywood, Florida, and in September of that year warned that if the Tribe and the State did not execute a compact within 60 days, the Department would issue Class III gaming procedures. Despite the parties’ failure to negotiate a compact, however, the Department never issued procedures.
Apparently exasperated with the slow progress of the procedures, in March 2007 the Tribe sued the Department in federal court. See Seminole Tribe of Fla. v. United States, No. 07-60317-CIV, 2007 WL 5077484 (S.D. Fla. filed Mar. 6, 2007). The Department then urged Governor Crist to negotiate a compact, warning that if a compact was not signed by November 15, 2007, the Department would finally issue procedures. Under the proposed procedures, the State would not receive any revenue and would have no control over the Tribe’s gaming operations. The Tribe would be authorized to operate slot machines and “card games,” defined as “a game or series of games of poker (other than Class II games) which are played in a nonbanking manner.” (Emphasis added.) Notably, the alternative procedures would not have permitted the Tribe to operate banked card games such as blackjack.[1]
On November 14 — the day before the deadline — the Governor agreed to a compact with the Tribe (Compact). Five days later, the House and its Speaker, Marco Rubio, filed this petition disputing the Governor’s authority to bind the State to the Compact without legislative authorization or ratification. We allowed the Tribe to join the action as a respondent.[2]
On January 7, 2008, upon publication of the Secretary’s approval, the Compact went into effect. See Notice of Deemed Approved Tribal-State Class III Gaming Compact, 73 Fed.Reg. 1229 (Jan. 7, 2008). The parties agree, however, that the Secretary’s approval does not render the petition moot.[3]
*1041 C. The Compact
The Compact recites that the Governor “has the authority to act for the State with respect to the negotiation and execution of this Compact.” It covers a period of twenty-five years and allows the Tribe to offer specified Class III gaming at seven casinos in the State. It establishes the terms, rights, and responsibilities of the parties regarding such gaming. We discuss only its more relevant provisions.
The Compact authorizes the Tribe to conduct “covered gaming,” which includes several types of Class III gaming: slot machines; any banking or banked card game, including baccarat, blackjack (twenty-one), and chemin de fer; high stakes poker games; games and devices authorized for the state lottery; and any new game authorized by Florida law. The Compact expressly does not authorize roulette- or craps-style games. The gaming is limited to seven casinos on tribal lands in six areas of the state: Okeechobee, Coconut Creek, Hollywood (two), Clewiston, Immokalee, and Tampa. Compact pt. IV. B., at 7-8.
The Compact grants the Tribe the exclusive right to conduct certain types of gaming. That is, the Tribe may conduct some Class III gaming, such as banked card games, that is prohibited under state law. Based on that “partial but substantial exclusivity,” the Tribe must pay the State a share of the gaming revenue. That share is based in part on amounts that increase at specified thresholds: when the Compact becomes effective, the State receives $50 million. Over the first twenty-four months of operation, it will receive another $175 million. Thereafter, for the third twelve months of operation the State will receive $150 million, and for each twelve-month cycle after that, a minimum of $100 million. If the State breaches the exclusivity provision, however — by legalizing any Class III gaming currently prohibited under state law — the Tribe may cease its payments. The Compact (attached as an appendix to this opinion) is thirty-seven pages long and contains several other provisions we need not detail here.[4]
II. JURISDICTION
Before discussing the issue presented, we first address our jurisdiction. The House and Speaker Rubio have filed in this Court a petition for writ of quo warranto. The Governor contends that this Court lacks jurisdiction because the House does not seek either to remove him from office or to enjoin the future exercise of his authority. We conclude, however, that these are not the only grounds for issuing such a writ.
The Florida Constitution authorizes this Court to issue writs of quo warranto to “state officers and state agencies.” Art. V, *1042 § 3(b)(8), Fla. Const. The term “quo war-ranto” means “by what authority.” This writ historically has been used to determine whether a state officer or agency has improperly exercised a power or right derived from the State. See Martinez v. Martinez, 545 So.2d 1338, 1339 (Fla.1989); see also art. V, § 3(b)(8), Fla. Const. Here, the Governor is a state officer. The House challenges the Governor’s authority to unilaterally execute the Compact on the State’s behalf.
The Governor argues that because he already has signed the Compact, quo war-ranto relief is inappropriate. But the writ is not so limited. In fact, petitions for the writ historically have been filed after a public official has acted. See, e.g., Chiles v. Phelps, 714 So.2d 453, 455 (Fla.1998) (holding that the Legislature and its officers exceeded their authority in overriding the Governor’s veto); State ex rel. Butterworth v. Kenny, 714 So.2d 404, 406 (Fla.1998) (issuing the writ after the Capital Collateral Regional Counsel had filed a federal civil rights suit, concluding that it had no authority to file it). The Governor’s execution of the Compact does not defeat our jurisdiction.
The concurring-in-result-only opinion expresses concern that by considering a more narrow issue than the Governor’s authority to execute IGRA compacts in general — that is, whether the Governor has the authority to bind the State to a compact that violates Florida law — we are expanding our quo warranto jurisdiction to include issues normally reserved for declaratory judgment actions. In prior quo warranto cases, however, we have considered separation-of-powers arguments normally reviewed in the context of declaratory judgments, such as whether the Governor’s action has usurped the Legislature’s power, “where the functions of government would be adversely affected absent an immediate determination by this Court.” Phelps, 714 So.2d at 457; see also Martinez, 545 So.2d at 1339 (holding quo warranto appropriate to test the governor’s power to call special sessions); Orange County v. City of Orlando, 327 So.2d 7 (Fla.1976) (holding that the legality of city’s actions regarding annexation ordinances can be inquired into through quo warranto).
In this case, the Secretary has approved the Compact and, absent an immediate judicial resolution, it will be given effect. In fact, according to news reports, the Tribe already has begun offering blackjack and other games at the Seminole Hard Rock Hotel and Casino. See Amy Driscoll, “Casino Gambling: Amid glitz, blackjack’s in the cards,” The Miami Herald, June 23, 2008, at Bl. Thus, if indeed the Governor has exceeded his constitutional authority, a compact that violates Florida law will, nevertheless, become effective in seven casinos located on tribal lands located in the state. As in Phelps, therefore, the importance and immediacy of the issue justifies our deciding this matter now rather than transferring it for resolution in a declaratory judgment action.
III. DISCUSSION OF LAW
We now discuss the law that applies to this inter-branch dispute. In deciding whether the Governor or the Legislature has the authority to execute a compact, we first define a “compact” and its historical use in Florida. We then discuss how other jurisdictions have resolved this issue. Next, we review the relevant provisions of our own constitution. Finally, we explain our conclusion that the Governor lacked authority under our state’s constitution to execute the Compact because it changes the state’s public policy as expressed in the criminal law and therefore infringes on the Legislature’s powers.
*1043 A. Compacts and their Use in Florida
A compact is essentially a contract between two sovereigns. Texas v. New Mexico, 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987); see Black’s Law Dictionary 298 (8th ed.1999) (defining a compact as “[a]n agreement or covenant between two or more parties, especially] between governments or states”). The United States Supreme Court has described compacts as “a supple device for dealing with interests confined within a region.” State ex rel. Dyer v. Sims, 341 U.S. 22, 27, 71 S.Ct. 557, 95 L.Ed. 713 (1951). The United States Constitution provides that “[n]o State shall, without the Consent of Congress ... enter into any Agreement or Compact with another State, or with a foreign Power.” U.S. Const, art. I, § 10. IGRA establishes the consent of Congress to execute gaming compacts, but requires federal approval before they become effective. See 25 U.S.C. § 2710(d)(8).
Like many states, Florida has executed compacts on a range of subjects, including environmental control, water rights, energy, and education — more than thirty in all. The vast majority were executed with other states. In most cases, the Legislature enacted a law. See, e.g., § 372.831, Fla. Stat. (2007) (“The Wildlife Violator Compact is created and entered into with all other jurisdictions legally joining therein in the form substantially as follows[.]”); § 257.28 (Interstate Library Compact); § 252.921 (Emergency Management Assistance Compact); § 322.44 (Driver License Compact). In others, the Legislature authorized the Governor to execute a compact in the form provided in a statute. See, e.g., § 370.19, Fla. Stat. (2007) (“The Governor of this state is hereby authorized and directed to execute a compact on behalf of the State of Florida with any one or more of [the following states] ... legally joining therein in the form substantially as follows[.]”); § 370.20 (containing the same authorization and establishing the terms for the Gulf States Marine Fisheries Compact); § 403.60 (using the same authorization language for the Interstate Environmental Control Compact, establishing its terms, and “signi[ying] in advance” the Legislature’s “approval and ratification of such compact”). In a few — including a compact among the State, the Tribe, and the South Florida Water Management District regulating water use on Tribal lands — the Legislature by statute approved and ratified the compact. § 285.165, Fla. Stat. (2007). Thus, by tradition at least, it is the Legislature that has consistently either exercised itself or expressly authorized the exercise of the power to bind the State to compacts. We have found no instance in which the governor has signed a compact without legislative involvement.
Although tradition bears some relevance, it does not resolve the question of which branch actually has the constitutional authority to execute compacts in general and gaming compacts in particular. As explained above, the Compact here governs Class III gaming on certain tribal lands in Florida. The issue is whether, regardless of whether the Governor bucked tradition, he had constitutional authority to execute the Compact without the Legislature’s prior authorization or, at least, subsequent ratification.
B. How Other Courts Have Answered the Question
Although Florida has not addressed a governor’s authority to bind a state to an IGRA compact, other states have. We examine but a few. In State ex rel. Stephan v. Finney, 251 Kan. 559, 836 P.2d 1169, 1182 (1992), the governor executed the compact. In deciding his authority to do so, the Kansas Supreme Court exam *1044 ined the “the nature of the obligations undertaken” by the executed IGRA compact. The court noted that many of the compact’s provisions were “clearly legislative in nature,” such as creating a state agency and assigning new duties to extant state agencies, and concluded that many provisions “would operate as the enactment of new laws and the amendment of existing laws.” Id. at 1185. The court therefore held that, although the governor had authority to negotiate the compact, “the Governor ha[d] no power to bind the State to the terms thereof.” Id.
The New York Court of Appeals has arrived at the same conclusion. After examining IGRA’s list of several permissible areas of negotiation for a tribal-state compact, see 25 U.S.C. § 1071(d)(3)(C), the court concluded that “these issues necessarily make fundamental policy choices that epitomize ‘legislative power.’ ” Saratoga County Chamber of Commerce, Inc. v. Pataki, 100 N.Y.2d 801, 766 N.Y.S.2d 654, 798 N.E.2d 1047, 1060 (2003).[5] Further, like the Kansas Supreme Court, the court found that the compact’s designation of an agency to oversee the gaming and the authority of the agency to promulgate rules “usurped the Legislature’s power.” 766 N.Y.S.2d at 668, 798 N.E.2d at 1061. The court held that the governor “lack[ed] the power unilaterally to negotiate and execute tribal gaming compacts under IGRA.” Id.
Applying the test of “whether the Governor’s action disrupts the proper balance between the executive and legislative branches,” the New Mexico Supreme Court similarly found a gaming compact unduly disruptive of the legislature’s powers. State ex rel. Clark v. Johnson, 120 N.M. 562, 904 P.2d 11, 23 (1995). The court found that the compact granted extended gaming rights, authorized gaming in contravention of legislative policy, and assigned the roles of the state and the tribe with respect to gaming regulation and civil and criminal jurisdiction. Id. at 23-24. Stating that “[r]esidual governmental authority should rest with the legislative branch rather than the executive branch,” id. at 24, the court held that the “Governor lacked authority under the state Constitution to bind the State by unilaterally entering into the compacts and revenue-sharing agreements in question.” Id. at 25; see also Panzer v. Doyle, 271 Wis.2d 295, 680 N.W.2d 666, 698, 700 (2004) (where a state statute authorized the governor to execute a gaming compact, holding that the governor exceeded his power by permitting the tribes to engage in certain games prohibited by state law and to waive state sovereign immunity).
*1045 Federal courts, too, have concluded that a state’s governor did not have the authority to bind the state to a gaming compact. In Pueblo of Santa Ana v. Kelly, 104 F.3d 1546, 1548 (10th Cir.1997), the circuit court held that the Secretary’s approval of a compact could not cure an ultra vires act by the state’s governor, and the question of “whether a state has validly bound itself to a compact” must be decided under state law. Id. at 1557. Noting the New Mexico Supreme Court’s “thorough and careful analysis of state law” in Clark, the Tenth Circuit accepted it as determinative on the question of whether its governor had authority to bind the state to the compacts. Id. at 1559.
In all these cases, to determine which branch had the authority to bind the state to the compact, courts analyzed the nature and effect of the IGRA compact at issue and compared it to the powers the state constitution delegated to the respective branches. The courts found the compacts within the legislative power because they created or assigned new duties to agencies, conflicted with state law, changed state law, or restricted the legislature’s power. Finally, recognizing that state legislative power is limited only by the state and federal constitutions, several courts have ascribed to the legislature, rather than the executive, any residual power on which the state constitutions were silent. See Clark, 904 P.2d at 25; Pataki, 766 N.Y.S.2d at 668 n. 11, 798 N.E.2d at 1061 n. 11. We now review our own state constitution in the context of IGRA’s provisions and the Compact signed in this case.
C. Florida Constitutional Provisions
The House contends that several of the Compact’s provisions encroach on the Legislature’s law- and policy-making powers. To answer the question, we first review the separation-of-powers provisions of the Florida Constitution and our interpretations of it. We then discuss one specific provision on which the Governor relies: the “necessary business” clause.
1. The Florida Constitution’s Delegation and Separation of Powers
The Florida Constitution generally specifies the relative powers of the three branches of government. Article II, section 3 provides innocuously that “[t]he powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.” In construing our constitution, we have “traditionally applied a strict separation of powers doctrine.” Bush v. Schiavo, 885 So.2d 321, 329 (Fla.2004) (quoting State v. Cotton, 769 So.2d 345, 353 (Fla.2000)).
These provisions are not specific, however. In fact, as we first noted 100 years ago, the state constitution does not exhaustively list each branch’s powers. State v. Atlantic Coast Line R.R. Co., 56 Fla. 617, 47 So. 969, 974 (1908). Both the Governor and the House concede that the state constitution does not expressly grant either branch the authority to execute compacts.
We must therefore expand our analysis beyond the plain language of the constitution. We have held that the powers of the respective branches “are those so defined ... or such as are inherent or so recognized by immemorial governmental usage, and which involve the exercise of primary and independent will, discretion, and judgment, subject not to the control of another department, but only to the limitations imposed by the state and federal Constitutions.” Id. at 974. A branch has “the inherent right to accomplish all objects naturally within the orbit of that department, not expressly limited by the *1046 fact of the existence of a similar power elsewhere or the express limitations in the constitution.” Sun Ins. Office, Ltd. v. Clay, 133 So.2d 735, 742 (Fla.1961) (quoting In re Integration of Neb. State Bar Ass’n, 275 N.W. 265, 266 (1937)). As we noted over seventy-five years ago, what determines whether a particular function is legislative, executive, or judicial “so that it may be exercised by appropriate officers of the proper department” is not “the name given to the function or to the officer who performs it” but the “essential nature and effect of the governmental function to be performed.” Florida Motor Lines v. Railroad Comm’rs, 100 Fla. 538, 129 So. 876, 881 (1930).
The House argues that, precisely because the state constitution does not expressly grant the governor authority to execute compacts, such authority belongs to the Legislature. In other words, the “residual” power — that is, powers not specifically assigned to the governor — belongs to the Legislature. Albeit many years ago and under different circumstances, we have implied as much. See State ex rel. Green v. Pearson, 153 Fla. 314, 14 So.2d 565, 567 (1943) (“The legislative branch looks to the Constitution not for sources of power but for limitations upon power. But if such limitations are not found to exist, its discretion reasonably exercised may not be disturbed by the judicial branch of the government.”); State ex rel. Cunningham v. Davis, 123 Fla. 41, 166 So. 289, 297 (1936) (“The test of legislative power is constitutional restriction; what the people have not said in their organic law their representatives shall not do, they may do.”). And, as we noted above, other state courts have ascribed to their legislatures any residual power on which the state constitutions were silent. See Clark, 904 P.2d at 25; Pataki, 766 N.Y.S.2d at 668, n. 11, 798 N.E.2d at 1061 n. 11.
We need not decide, however, whether the authority to bind the state to compacts always resides in the legislature. Although the line of demarcation is not always clear, we have noted that “the legislature’s exclusive power encompasses questions of fundamental policy and the articulation of reasonably definite standards to be used in implementing those policies.” B.H. v. State, 645 So.2d 987, 993 (Fla.1994); see also Askew v. Cross Key Waterways, 372 So.2d 913, 925 (Fla.1978) (stating that under the nondelegation doctrine, “fundamental and primary policy decisions shall be made by members of the legislature”). Therefore, even if the Governor has authority to execute compacts, its terms cannot contradict the state’s public policy, as expressed in its laws.
2. IGRA and the “Necessary Business” Clause
The Governor argues that his authority to execute the Compact derives from article TV, section 1 of the Florida Constitution. That provision states in part that “[t]he governor shall take care that the laws be faithfully executed ... and transact all necessary business with the officers of government.” Art. IV, § 1(a), Fla. Const. The Governor submits that the phrase “transact all necessary business with the officers of government” includes negotiating with the Tribe and that he cannot ignore the federal directive to “negotiate”; therefore, negotiating the Compact was “necessary business” under IGRA.
IGRA provides that a tribe seeking to offer Class III gaming must “request [that] the State ... enter into negotiations” for a compact and that the “State shall negotiate with the Indian tribe in good faith.” 25 U.S.C. § 2710(d)(3)(A). The Governor is therefore correct that IGRA requires states to negotiate. As other courts have recognized, however, no *1047 where does IGRA equate “the state” with “the governor.” See Seminole Tribe, 517 U.S. at 75 n. 17, 116 S.Ct. 1114 (contrasting IGRA’s “repeated[ ] references] exclusively to ‘the State’ ” with other federal statutes directed at a state’s governor and concluding that “the duty imposed by the Act ... is not of the sort likely to be performed by an individual state executive officer or even a group of officers”); Seminole Tribe, 11 F.3d at 1029 (“IGRA uniformly addresses itself to ‘the State’; not once does it impose duties or responsibilities on a particular officer of the state (e.g., the governor, the legislature, etc.).”).[6] In addition, when a state fails to negotiate, a tribe must sue the state, not the governor. Seminole Tribe, 517 U.S. at 74-75, 116 S.Ct. 1114 (holding that Congress intended § 2710(d)(3) to be enforced against the state, not the governor); Seminole Tribe, 11 F.3d at 1029 (“[TJhese suits are not against officials in an attempt to force them to follow federal law.”).
More importantly, a State’s “duty to negotiate” under IGRA cannot be enforced. A state may avoid its duty, as Florida has effectively done, by asserting its immunity. Seminole Tribe, 517 U.S. at 47, 116 S.Ct. 1114. Therefore, although IGRA requires a state to negotiate, it does not impose any duty on a state’s governor. Moreover, IGRA does not prescribe the terms of a compact, see 25 U.S.C. § 2710(d), and it does not confer on the governor the authority to bind the state to a compact or act in contravention to state law. In other words, IGRA does not grant a governor, or any state actor, any powers beyond those provided by the state’s constitution and laws. See Clark, 904 P.2d at 26 (“We do not agree that Congress, in enacting the IGRA, sought to invest state governors with powers in excess of those that the governors possess under state law.”).
We express no opinion on whether the “necessary business” clause may ever grant the governor authority to bind the State to an IGRA compact.[7] We do conclude, however, that the clause does not authorize the governor to execute compacts contrary to the expressed public policy of the state or to create exceptions to the law. Nor does it change our conclusion that “the legislature’s exclusive power encompasses questions of fundamental policy and the articulation of reasonably definite standards to be used in implementing those policies.” B.H., 645 So.2d at 993.
We now discuss why, in authorizing conduct prohibited by state law, the Governor exceeded his authority.
D. The Compact Violates the Separation of Powers
The House claims that the Compact violates the separation of powers on a number of grounds.[8] We find one of them *1048 dispositive. The Compact permits the Tribe to conduct certain Class III gaming that is prohibited under Florida law. Therefore, the Compact violates the state’s public policy about the types of gambling that should be allowed. We hold that, whatever the Governor’s authority to execute compacts, it does not extend so far. The Governor does not have authority to agree to legalize in some parts of the state, or for some persons, conduct that is otherwise illegal throughout the state.
We first discuss whether state laws in general, and gaming laws in particular, apply to Indian tribes. We next discuss Florida law on gaming. We then address the House’s argument that IGRA prohibits compacts from expanding the gaming allowed under state law. Finally, we explain why the Governor lacked authority to bind the State to a compact, such as this one, that contradicts state law.
1. State Gaming Laws Apply to the Tribe
Generally, state laws do not apply to tribal Indians on Indian reservations unless Congress so provides. McClanahan v. State Tax Comm’n of Ariz., 411 U.S. 164, 170, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Therefore, the extent to which a state may enforce its criminal laws on tribal land depends on federal authorization. See Seminole Tribe of Fla. v. Butterworth, 658 F.2d 310, 312 (5th Cir.1981). Congress has, however, conferred on the states the authority to assume jurisdiction over crimes committed on tribal land, see Act of Aug. 15, 1953, Pub.L. No. 280 § 6, 67 Stat. 588, 590 (1953), and Florida has assumed such jurisdiction. See ch. 61-252, §§ 1-2, at 452-53, Laws of Fla. (codified at § 285.16, Fla. Stat. (2007)); see also § 285.16(2), Fla. Stat. (2007) (“The civil and criminal laws of Florida shall obtain on all Indian reservations in this state and shall be enforced in the same manner as elsewhere throughout the state.”); Op. Att’y Gen. Fla. 94-45 (1994) (discussing the state’s jurisdiction over Indian reservations). The state’s law is therefore enforceable on tribal lands to the extent it does not conflict with federal law. See Op. Att’y Gen. Fla. 94-45 (1994); see also Hall v. State, 762 So.2d 936, 936-38 (Fla. 2d DCA 2000) (holding that the circuit court had jurisdiction over a vehicular homicide on an Indian reservation); State v. Billie, 497 So.2d 889, 892-95 (Fla. 2d DCA 1986) (holding that a Seminole Indian was properly charged under state criminal law with killing a Florida panther on tribal land). In regard to gambling in particular, federal law provides that, except as provided in a tribal-state compact, state gambling laws apply on tribal lands. See 18 U.S.C. § 1166(a) (2000).
Based on these state and federal provisions, what is legal in Florida is legal on tribal lands, and what is illegal in Florida is illegal there. Absent a compact, any gambling prohibited in the state is prohibited on tribal land.
2. Florida’s Gaming Laws
It is undisputed that Florida permits limited forms of Class III gaming. The *1049 state’s constitution authorizes the state lottery, which offers various Class III games, and now permits slot machines in Miami-Dade and Broward Counties. See art. X, §§ 7, 15, Fla. Const. For a long time, the State also has regulated pari-mutuel wagering — for example, on dog and horse racing. See ch. 550, Fla. Stat. (2007) (governing pari-mutuel wagering).
It is also undisputed, however, that the State prohibits all other types of Class III gaming, including lotteries not sponsored by the State and slot machines outside Miami-Dade and Broward Counties. Florida law distinguishes between nonbanked (Class II) card games and banked (Class III) card games.[9] A “banking game” is one “in which the house is a participant in the game, taking on players, paying winners, and collecting from losers or in which the cardroom establishes a bank against which participants play.” § 849.086(2)(b); see § 849.086(1), Fla. Stat. (deeming banked games to be “casino gaming”). Florida law authorizes card-rooms at pari-mutuel facilities for games of “poker or dominoes,” but only if they are played “in a nonbanking manner.” § 849.086(2), Fla. Stat.; see § 849.086(1)-(3). Florida law prohibits banked card games, however. See § 849.086(12)(a), (15)(a). Blackjack, baccarat, and chemin de fer are banked card games. They are therefore illegal in Florida.
3. Does IGRA Permit Compacts to Expand Gaming?
Contrary to Florida law, the Compact allows banked card games such as blackjack, baccarat, and chemin de fer. The House argues that the Compact therefore violates IGRA itself, which permits Class III gaming only if the state “permits such gaming for any purpose by any person, organization, or entity.” 25 U.S.C. § 2710(d)(1). The Governor, on the other hand, contends that, once state law permits any Class III gaming, a compact may allow all Class III gaming.
The meaning of the phrase “permits such gaming” has been heavily litigated. The question is whether, when state law permits some Class III games to be played, a tribe must be permitted to conduct only those particular games or all Class III games. See Kathryn R.L. Rand, Caught in the Middle: How State Politics, State Law, and State Courts Constrain Tribal Influence Over Indian Gaming, 90 Marq. L.Rev. 971, 983 (2007) (citing cases). The Secretary’s interpretation of this provision supports the House’s argument. See Class III Gaming Procedures, 63 Fed. Reg. 3289, 3293 (Jan. 22, 1998) (Proposed Rules) (“IGRA thus makes it unlawful for Tribes to operate particular Class III games that State law completely and affirmatively prohibits.”). So do a majority of federal courts. See, e.g., Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250, 1258 (9th Cir.1994) (“[A] state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have.”); see also Cheyenne River Sioux Tribe v. South Dakota, 3 F.3d 273, 279 (8th Cir.1993) (stating that IGRA “does not require the state to negotiate with respect *1050 to forms of gaming it does not presently permit”); but see Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin, 770 F.Supp. 480, 486 (W.D.Wis.1991) (“Congress did not intend the term ‘permits such gaming’ to limit the tribes to the specific types of gaming activity actually in operation in a state.”). Our Attorney General has agreed with the majority interpretation. See Op. Att’y Gen. Fla.2007-36 at 3 (2007) (“[I]n light of the greater weight of federal case law and the Department of the Interior’s interpretation of IGRA, Class III gaming activities subject to mandatory negotiations between a state and an Indian tribe do not include those specifically prohibited by state law.”).
Whether the Compact violates IGRA, however, is a question we need not and do not resolve. Given our narrow scope of review on a writ of quo warranto, the issue here is only whether the Florida Constitution grants the Governor the authority to unilaterally bind the State to a compact that violates public policy. We conclude that even if the Governor is correct that IGRA permits the expansion of gaming on tribal lands beyond what state law permits, such an agreement represents a significant change in Florida’s public policy. It is therefore precisely the type of action particularly within the Legislature’s power. We now discuss that issue.
4. The Compact Violates Florida’s Public Policy on Gaming
Article II, section 3 of the Florida Constitution prohibits the executive branch from usurping the powers of another branch. Enacting laws — and especially criminal laws — is quintessential^ a legislative function. See State v. Barquet, 262 So.2d 431, 433 (Fla.1972) (“The lawmaking function is the chief legislative power.”). By authorizing the Tribe to conduct “banked card games” that are illegal throughout Florida — and thus illegal for the Tribe — the Compact violates Florida law. See Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260, 264 (Fla.1991) (“This Court has repeatedly held that, under the doctrine of separation of powers, the legislature may not delegate the power to enact laws or to declare what the law shall be to any other branch.”). The Governor’s action therefore encroaches on the legislative function and was beyond his authority. Nor does it matter that the Compact is a contract between the State and the Tribe. Neither the Governor nor anyone else in the executive branch has the authority to execute a contract that violates state criminal law. Cf. Local No. 234, United Assoc. of Journeymen & Apprentices of Plumbing & Pipefitting Industry v. Henley & Beckwith, Inc., 66 So.2d 818, 821 (Fla.1953) (“[A]n agreement that is violative of a provision of a constitution or a valid statute, or an agreement which cannot be performed without violating such a constitutional or statutory provision, is illegal and void.”); City of Miami v. Benson, 63 So.2d 916, 923 (Fla.1953) (“The contract in question, that is, the acceptance by the City of the proposal made by its agent, employee or advisor, to purchase the bonds, is contrary to public policy and is, therefore, void.”).
IV. CONCLUSION
We conclude that the Governor’s execution of a compact authorizing types of gaming that are prohibited under Florida law violates the separation of powers. The Governor has no authority to change or amend state law. Such power falls exclusively to the Legislature. Therefore, we hold that the Governor lacked authority to bind the State to a compact that violates Florida law as this compact does. We need not resolve the broader issue of whether the Governor ever has the authority to execute compacts without either the Legislature’s prior au *1051 thorization or, at least, its subsequent ratification. Because we believe the parties will fully comply with the dictates of this opinion, we grant the petition but withhold issuance of the writ.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, and BELL, JJ., concur.
QUINCE, C.J., concurs in result only.
LEWIS, J., concurs in result only with an opinion.

. During this period, two separate but identical bills designating the Governor to negotiate and execute a compact and submit it for ratification by the legislature were not voted on by the House of Representatives. See Fla. SB 160 (2007); Fla. HB 209 (2007).

. We also allowed other organizations to file briefs as amici curiae in support of the House: the Florida Senate, the Gulfstream Park Racing Association, and the City of Hallandale Beach.

.The federal district court, however, concluded that such approval did render the Tribe’s suit moot. Seminole Tribe of Fla. v. United States, No. 07-60317-CIV (S.D. Fla. order filed June 20, 2008). The court dismissed the Tribe’s case and noted that the Tribe already had begun operating under the Compact's terms.

. For example, Part V provides that the Tribe will establish rules, regulations, and minimum operational requirements of gaming facilities under the Compact. The "State Compliance Agency” — which is earlier defined as “the Governor or his designee unless and until an SCA has been designated by the Legislature,” see Compact at 7 — "may propose additional rules and regulations consistent with and related to the implementation of this Compact....” Compact at 9. In addition, "the State may secure an annual independent financial audit of the conduct of Covered Games subject to this Compact,” may request meetings with the Tribe regarding the audit, and may select the independent auditor. Compact at 11-12. Part VI addresses tort claims and remedies for patrons and provides that employee claims will be addressed under the Tribe’s workers' compensation regulation. Compact at 15. Part VII places regulation of the activities governed by the Compact exclusively with the Tribe. Compact at 17. Part VIII addresses the State's power, through the State Compliance Agency, to monitor the gaming, specifying the terms for the Agency's visits to gaming facilities. Compact at 19.

. IGRA lists several permissible subjects for negotiation:
(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
(v) remedies for breach of contract;
(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
(vii) any other subjects that are directly related to the operation of gaming activities.
25 U.S.C. § 2710(d)(3)(C).

. IGRA contains a solitary reference to a state's governor — in an unrelated section addressing the Secretary's authority to permit gaming on specific lands. See 25 U.S.C. § 2719. Congress knew how to refer to a "governor” when it wanted to do so.

. We note that the Governor relies on Dewberry v. Kulongoski, 406 F.Supp.2d 1136 (D.Or.2005), in which Oregon citizens argued that the governor lacked authority to bind the state to an IGRA compact. Despite dismissing the case on procedural grounds, the judge noted that a state constitutional provision conferring authority on the governor to "transact all necessary business with the officers of government" authorized the governor to execute the gaming compact. Id. at 1154— 55. We do not find this dictum persuasive. Id. at 1142.

.The House argues that the Compact significantly changes Florida law and policy in a number of ways: it authorizes Class III slot machines outside of Broward County; it allows blackjack and other banked card games that are currently illegal throughout Florida; it provides for collection of funds from tribal *1048 casinos for State purposes under a revenue-sharing agreement and penalizes the State for any expansion of non-tribal gaming; it allows an exception to Florida’s substantive right of access to public records for information dealing with Indian gaming; it changes the venue of litigation dealing with individual disputes with the tribal casinos; it sets procedures for tort remedies occurring in certain circumstances; it waives sovereign immunity to the extent that it creates enforceable contract rights between the State and the Tribe; and it establishes a regulatory mechanism to be undertaken by the Governor or his designee. Because of our resolution of this case, we need not consider whether these other provisions encroach on the legislature’s policy-making authority.

. Chapter 849, Florida Statutes (2007), regulates most gaming. It prohibits playing “any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value," designating it a second-degree misdemeanor. § 849.08, Fla. Stat. (2007). Certain "penny-ante games” are exempted when "conducted strictly in accordance” with the law. § 849.085, Fla. Stat. (2007) (“ 'Penny-ante game' means a game or series of games of poker, pinochle, bridge, rummy, canasta, hearts, dominoes, or mah-jongg in which the winnings of any player in a single round, hand, or game do not exceed $10 in value.”).